UNITED STATES of America, Appellee,

v.

Edward A. CINCOTTA, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

John ZERO, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

MYSTIC FUEL, INC., Defendant,
Appellant.

Nos. 81–1141, 81–1408, 81–1147, 81–1409,
81–1155 and 81–1407.

United States Court of Appeals,
First Circuit.

Argued May 3, 1982.

Decided Aug. 4, 1982.

Certiorari Denied Nov. 8, 1982.
See 103 S.Ct. 347.

Harvey R. Peters, with whom Paul T. Smith, and Jeffrey M. Smith, Boston, Mass., were on brief, for Edward A. Cincotta.

Joseph J. Balliro, with whom Juliane Balliro, Boston, Mass., was on brief, for John Zero.

Richard M. Passalacqua, with whom Franklin, Pearlstein & Passalacqua, Boston, Mass., was on brief, for Mystic Fuel, Inc.

Bruce A. Singal, Asst. U. S. Atty., with whom William F. Weld, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, PHILLIPS,* Senior Circuit Judge, CAMPBELL, Circuit Judge.

COFFIN, Chief Judge.

This criminal appeal challenges the trial court's disposition of five issues, pertaining to the sufficiency of the evidence against one individual defendant, the sufficiency of the evidence and indictment against the corporate defendant, and, involving both individual defendants, the adequacy of remedies for prosecutorial misconduct, the admissibility of a hearsay document, and the propriety of a jury instruction on the implications of a defendant's conscious avoidance of knowledge.

### Factual Background

Appellant Mystic Fuel Corporation (Mystic) was engaged in the business of delivering heating oil to oil consumers. It did not own or rent oil storage tanks, but it did own several trucks for transporting oil. It used those trucks to earn money in two different ways: it entered delivery contracts whereby oil suppliers without trucks would pay Mystic a commission to deliver oil to the suppliers' customers; and it entered supply contracts whereby oil consumers would buy oil directly from Mystic, which Mystic would then acquire in its own name from suppliers.

Appellant Cincotta was a major stockholder in Mystic, and its Treasurer. He signed all the company's checks, bids, and contracts. Together with appellant Zero, he made all the major decisions of the company, as well as the rules governing its daily operation.

Appellant Zero was also a major stockholder in Mystic, and its dispatcher. He hired the truck drivers, and issued their daily orders on where to pick up and deliver oil. He also supervised Mystic's billing and accounting.

At trial, the government set forth evidence of a scheme through which Mystic would defraud the United States Department of Defense, inducing it to pay for oil that Mystic would sell in its own name to its own clients. The evidence suggested that during fiscal year 1978 (September 1, 1977, through August 31, 1978) Mystic had a delivery contract giving it a commission for delivering "number four oil" (a moderately heavy oil, generally used to heat small industrial buildings, schools, and medium-sized apartment buildings) from the Union Petroleum Corporation (Union) to Fort Devens in Ayer, Massachusetts. The evidence suggested further that on numerous occasions Mystic picked up a shipment of oil at Union, representing that the oil was for delivery to Fort Devens. Then, Mystic would sell the shipment to its own consumer clients. Finally, it would tell the Fort Devens authorities that it had in fact delivered the shipment to Fort Devens, inducing the Department of Defense to pay Union for the shipment. The net result was that Fort Devens paid for shipments it never received, and Mystic was able to sell oil that it had never paid for.

After a two-week trial, the jury deliberated for ten hours and then found all three defendants guilty of (1) conspiring to defraud the United States in violation of 18 U.S.C. § 371, of (2) wilfully causing seven specific false claims to be made against the United States, in violation of 18 U.S.C. §§ 2, 287, and of (3) knowingly and wilfully making and using seven specific false documents in relation to a matter within the jurisdiction of a United States department, in violation of 18 U.S.C. §§ 2, 1001.

### Sufficiency of the Evidence Against Cincotta

■ Appellant Cincotta contends that the trial judge erred in denying his motion for a judgment of acquittal at the close of the

---

* Of the Sixth Circuit, sitting by designation.

government's case. He argues that the evidence was not sufficient to permit the jury to conclude beyond a reasonable doubt that he personally violated the statutes under which he was convicted. Although he does not contest the sufficiency of the evidence establishing a conspiracy to present false claims, he does contest the sufficiency of the evidence that he was a part of the conspiracy.

Our review of the trial judge's decision on this point is quite limited. We are required to affirm that decision unless the evidence, viewed in the light most favorable to the government, could not have persuaded any rational trier of fact that Cincotta was guilty beyond a reasonable doubt. Moreover, "[p]articipation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and a collocation of circumstances.'" *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942) (citation omitted).

Given this standard of review, we cannot reverse the trial judge's decision. Although there was no "smoking gun" that directly demonstrated Cincotta's sponsorship of the fraudulent conspiracy, there was ample circumstantial evidence. The principal source of that evidence was Elaine Kelly, Cincotta's secretary at Mystic. Mrs. Kelly testified that all major decisions at Mystic were made by either Cincotta or Zero. She testified further that "John Zero and Eddie Cincotta talked over everything that was going on ... [W]ho eventually made the final decision I don't know. I would think it would be a mutual thing, or maybe one or the other had a better decision than the other." She also testified that Cincotta "made all the rules ... for the truck drivers, during the course of the day." Although Zero normally gave the drivers their instructions regarding deliveries to Fort Devens, Cincotta gave them their instructions in Zero's absence. And although Zero and Cincotta mutually handled all company firing decisions, Cincotta alone signed the corporation's checks, contracts, and bids. Finally, the extent of Cincotta's interest in Mystic's activities is magnified by the fact

that his mother and two uncles worked with him in the small company office.

In addition to Mrs. Kelly's testimony there was corroboration in regard to the Fort Devens fraud in the testimony of other witnesses. Frederick Taubert, the Vice President of Marketing at Union Petroleum, testified that he dealt with either Zero or Cincotta on any issues involving the Fort Devens contract, and that he perceived Cincotta to be in charge of the whole operation of Mystic on a day-to-day basis. Patricia Phelan, the supply clerk and ordering officer at Fort Devens, testified that Zero and Cincotta usually came in together twice a week to have her sign the fuel tickets acknowledging delivery of fuel shipments to Fort Devens. She testified further that on those occasions when another Mystic employee brought in the fuel tickets for her signature, if the tickets did not show to what building the oil had allegedly been delivered she would call up Zero or Cincotta and they would give her a building number to fill in. And several truck drivers, including Anthony Carpenter and Brian Esterbrook, referred to the duo collectively, as "John or Eddie", "Zero or Cincotta", in describing the source of their delivery instructions.

In sum, there was sufficient evidence of Cincotta's pervasive involvement in Mystic's operations—both generally and with regard to the Fort Devens deliveries in particular—for a reasonable juror to infer that Cincotta knew of, profited from, and encouraged the conspiracy and each of the individual fraudulent acts that underlay the substantive counts for which he was convicted.

*Sufficiency of the Evidence and Adequacy Of the Indictment Against Mystic Fuel*

█ A corporation may be convicted for the criminal acts of its agents, under a theory of respondeat superior. But criminal liability may be imposed on the corporation only where the agent is acting within the scope of employment. That, in turn, requires that the agent be performing acts

of the kind which he is authorized to perform, and those acts must be motivated—at least in part—by an intent to benefit the corporation. *United States v. DeMauro*, 581 F.2d 50, 54 n.3 (2d Cir. 1978); *United States v. Beusch*, 596 F.2d 871, 878 & n.7 (9th Cir. 1979). Thus, where intent is an element of a crime (as it is here), a corporation may not be held strictly accountable for acts that could not benefit the stockholders, such as acts of corporate officers that are performed in exchange for bribes paid to the officers personally.

■ Mystic argues that the trial court erred in denying its motion for acquittal. It contends that the government failed to produce evidence of Cincotta's and/or Zero's intent to benefit the corporation through their scheme to defraud the United States. This argument may be rejected out of hand. The mechanism by which the fraudulent scheme worked required money to pass through Mystic's treasury. When Fort Devens paid Union for the undelivered shipments, the shipments were not resold in Zero's name or Cincotta's name. Rather, they were sold to Mystic's customers in Mystic's name. Mystic—not the individual defendants—was making money by selling oil that it had not paid for.

■ Mystic also argues that, even if there was adequate proof against it at trial, the indictment was fatally defective because it failed to aver that the individual defendants intended to benefit the corporation through their scheme. It is well settled that an indictment must charge all of the essential elements of the crime in question. *E.g., United States v. Barbato*, 471 F.2d 918 (1st Cir. 1973). But, to be sufficient, "these elements need not always be set forth *in haec verba*. Indictments 'must

be read to include facts which are necessarily implied by the specific allegations made.'" *Id.* at 921 (citation omitted). *See also United States v. McLennan*, 672 F.2d 239 (1st Cir. 1982). "It is a cardinal principle of our criminal law that an indictment is sufficient which apprises a defendant of the crime with which he is charged so as to enable him to prepare his defense and to plead judgment of acquittal or conviction as a plea to a subsequent prosecution for the same offense." *Portnoy v. United States*, 316 F.2d 486, 488 (1st Cir.), *cert. denied*, 375 U.S. 815, 84 S.Ct. 48, 11 L.Ed.2d 50 (1963).

We believe the indictment against Mystic was sufficient under that standard. The three crimes charged all require, as an essential element, criminal intent. The indictment specifically alleges that Mystic Fuel had the requisite intent on each count.[1] Mystic emphasizes that, as a corporation, it could only possess the requisite criminal intent if one of its agents intended to benefit the corporation by his wrongful act. It contends that the agents' intent to benefit it is therefore an essential element of the crime and must be alleged specifically. We reject such analysis, for it would stand the principles of *Barbato, supra,* and *Portnoy, supra,* on their respective heads. It would require an indictment to specifically allege any facts "which are necessarily implied by the specific allegations made". It would require the indictment against Cincotta and Zero to allege that they were awake at the time of their actions because that is the only way they could have possessed the requisite criminal intent. Such is clearly not the law. The allegations that Mystic knowingly and wilfully (1) conspired, (2) presented the specific false claims listed

---

1. Paragraph 13 of the indictment provides:
   "[T]he defendants *MYSTIC FUEL, INC.,* EDWARD A. CINCOTTA and JOHN ZERO *willfully, knowingly* and unlawfully *entered into an agreement* ... *[t]o defraud* the United States by failing to deliver [oil] and ... *to willfully* cause to be made and presented claims upon or against the United States Department of Defense ..., *knowing said claims to be false,* fictitious and fraudulent ... and ... *[t]o knowingly and willfully*

make and cause to be made false, fictitious and fraudulent statements and representations, and use and cause to be used false writings and documents, *knowing the same to contain false,* fictitious and fraudulent statements...." (emphasis added)
Similar allegations of Mystic's intent and knowledge are found in the paragraphs of the indictment setting forth the substantive counts, namely paragraphs 17, 19, and 21.

in the indictment, and (3) made the specific false statements listed in the indictment, were adequate to apprise the corporation of the crime with which it was charged, to enable the corporation to prepare its defense, and to allow the corporation to plead its judgment of conviction here in response to any subsequent prosecution for the same offense.

### Other Issues Raised by Appellants

█ The other issues presented on appeal deserve more limited treatment. Zero and Cincotta both challenge the district court's decision to admit into evidence pages from a notebook kept by John Glencross, a Mystic truck driver during the period of the indictments. Glencross used the notebook to keep track of all his deliveries, since he was paid $25 for each load delivered. The exhibit was a key link in the government's case, since it indicated shipments that Glencross had picked up under the Fort Devens account but delivered to Mystic's commercial customers. The appellants admit that the pages were relevant, but argue that they should have been excluded as hearsay. They argue that the hearsay exception for "records of regularly conducted activity", Fed.R.Evid. 803(6), was inapplicable because "the source of information or the method or circumstances of preparation indicate lack of trustworthiness." *Id.*

The question of trustworthiness was argued extensively before the trial judge, who acknowledged that the effective cross-examination of Glencross, and some errors in the notebook brought out by that cross-examination, made the notebook "untrustworthy standing alone". Nonetheless, the court concluded that the notebook was "sufficiently reliable to put in evidence" because it was corroborated in many instances (and in all instances relating to deliveries associated with the defendants' convictions) by delivery tickets issued by Mystic and signed by its commercial customers. "The determination of whether a foundation has been laid for application of [Federal Rule of Evidence 803(6)] and whether the circumstances indicate untrustworthiness, is within the discretion of the district court." *United States v. Patterson*, 644 F.2d 890 (1st Cir. 1981). We are not persuaded that the trial court abused its discretion in choosing to admit the records.

█ Zero and Cincotta also challenge the trial court's jury instruction on when "conscious avoidance of knowledge" is adequate to demonstrate criminal intent.[2] They argue that there was no evidentiary predicate for the charge. We disagree. There was sufficient evidence that a reasonable juror could have concluded that Cincotta, in bringing delivery tickets to Fort Devens for signature, consciously chose not to know whether the deliveries had been made, when he had reason to believe that they had not been made. The appellants also argue that the charge was deficient because it did not include "balancing language" instructing the jurors that wilful blindness constitutes knowledge of a fact only where the individual is aware of a high probability that the fact exists and where the individual does not subjectively disbelieve the fact. *See United States v. Jewell*, 532 F.2d 697, 704 n.21 (9th Cir. 1976). Although such language may indeed

---

2. Appellant Cincotta contends that the instruction unfairly surprised him because it was not discussed until after the close of evidence, leaving him no opportunity to develop evidence "through cross-examination or otherwise" that he had not closed his eyes to facts which should have prompted him to investigate. We detect no such prejudice. The conscious avoidance principle means only that specific knowledge may be inferred when a person knows other facts that would induce most people to acquire the specific knowledge in question. Thus, if someone refuses to investigate an issue that cries out for investigation, we may pre-

sume that he already "knows" the answer an investigation would reveal, whether or not he is "certain". *See generally United States v. Jewell*, 532 F.2d 697, 699–704 (9th Cir. 1976). Evidence of conscious avoidance is merely circumstantial evidence of knowledge; a defendant who seeks to refute such evidence follows the same course no matter how the evidence is labeled. In short, a defendant accused of a crime involving knowledge must be prepared to meet both direct and circumstantial evidence, of which "conscious avoidance" is a major subset.

provide useful clarification, the defendants did not ask for it to be included, and the failure to use it is not plain error. *See United States v. Ciampaglia*, 628 F.2d 632, 642–43 (1st Cir.), *cert. denied*, 449 U.S. 956, 101 S.Ct. 365, 66 L.Ed.2d 221 (1980). Appellant Zero argues that the instruction raised an unconstitutional presumption of guilt against him when, in attempting to relate the conscious avoidance charge to the facts of the case, the court said, "There has been a great deal of evidence with respect to what was done by the defendant Mr. Zero, but a relatively small amount of evidence with respect to the defendant Mr. Cincotta." Although we can appreciate appellant's point, we believe the trial court nullified any potential prejudice when, only four sentences later, it continued:

> "Now, giving you that instruction I hope you know does not constitute any comment by the Court on the weight of the evidence. The Court is not suggesting that you find that Mr. Cincotta consciously avoided knowledge here of things that were going on, nor does the Court imply that what Mr. Zero did or did not do is a basis for his being either convicted or acquitted. That is what is meant when it says that you are the exclusive judges of the facts."

Finally, both appellants attack the trial judge's refusal to impose more severe sanctions against the government for mailing a letter and an eight-page document to prospective government witnesses. The trial court found that the letter and document were improper for two reasons: they discouraged the witnesses from speaking to defense counsel, thereby denying the defendants access to them, and they improperly coached the witnesses on how to present their testimony. Specifically, the mailing conveyed the implicit and explicit message that the witnesses were partisans enlisted by the prosecution to help it win its case, that the defense attorneys were adversaries who would assault their integrity, and that the witnesses should avoid embarrassing the prosecution if they could do so and still tell the truth. The trial court sought to remedy this misconduct by instructing the witnesses before trial on their proper roles. The court told the witnesses specifically that the government had acted improperly. It explained in great detail precisely why the government conduct was improper. It then set forth a correct description of the role of witnesses in a criminal trial and admonished the witnesses to keep that proper role in mind.[3] In the case of wit-

---

3. The district court's efforts in this regard were exemplary. Although anything less than a full transcript inadequately reveals the care and discernment with which it educated the witnesses, a few excerpts can convey the flavor.

All witnesses who had read the Points for Prospective Witnesses were told:

> "[T]his letter of December 16th and its enclosed Points for Prospective Witnesses constituted improper coaching of witnesses *for the government by government counsel* ... The [principal error] is that it implies that being called as a witness for the government allies you with the government in the trial of this case. You are not witnesses for the government. You are witnesses for the system[,] the court[,] the jury that will be hearing this case. [The pamphlet] equates credibility with just truthfulness, and it makes it appear that cross-examination of a witness by defense counsel must implicitly be attacking the truthfulness or the character of a witness, and that is just wrong.... [Cross-examination] is less often directed to challenging the truthfulness of a witness than it is the other elements of credibility ... the

witness' ability to observe things accurately and to recall things accurately.... [The pamphlet states,] 'If you are asked, "Did anything else happen at that time, or was anything else said?" you can be sure that you have omitted a fact which you mentioned to the U.S. Attorney or to the government agent previously.' [That statement erroneously] identifies everything that you have said to a government investigator or to a government lawyer *as a fact, that is to say, a correct statement*, whereas the whole process here of the trial is designed to ascertain what the facts really were[;] you may have been mistaken in something you have stated heretofore in the course of preliminary interviewing .... [The pamphlet states,] 'Beware of leading questions containing half-truths, and beware of Yes or No,' the implication again being that the point to cross-examination is to trick you or to confuse you.... You are not to beware of the questions that lawyers on either side of the case ask, or, on occasion, the judge may ask a question. Your obligation is to the jury ... to testify truthfully, candidly, but not as if you were allied

nesses who had refused to speak with defense attorneys, the court specifically admonished them to reconsider their decision.[4]

The appellants contend that this was an inadequate corrective response. They suggest that the trial court should have dismissed the indictments, prohibited the witnesses from testifying, or at the very least instructed the jury that the witnesses had been improperly coached. We conclude that the court below responded in a thoroughly satisfactory manner. On the question of denial of access to government witnesses, the appellants have not shown any particularized prejudice from the combination of misconduct and trial court remedy. *See United States v. Morrison*, 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981). After the court's curative charge, only three witnesses—all employees of Union Petroleum—refused to meet with the defense; all three continued their refusal after consulting with Union's corporate counsel, and it is far more likely that they were responding to the company's fear of civil liability to the government for undelivered oil than to any residual influence of the government's letter. On the question of improper coaching, we are not persuaded that these defendants were deprived of a fair trial or suffered any impairment of their rights to cross-examination. The only prejudice that the prosecutorial misconduct could have caused was the instillment of a general attitude of fear and hostility in the witnesses. The trial court's lecture was more than sufficient to correct any improper attitudes before the witnesses took the stand. The court also offered to read the complete mailing to the jury and to allow the defendants to cross-examine the witnesses about the mailings. It adequately defused whatever risk of prejudice had been created by the prosecutorial misconduct.

*The judgments of conviction are affirmed.*

---

or linked to either side of the case.... At the end, it is stated incorrectly ... that 'The length of time other witnesses will take is largely beyond the control of the government, as it depends on the length of cross-examination.' This sentence, like so many other sentences, makes it appear that the government here is solicitous for you and your welfare and your convenience, but other persons connected with the case might not be so solicitous. That just isn't so."

4. The witnesses who had refused to meet with defense counsel before trial were told:

"[T]here ha[s] been an improper discouraging of access to defense counsel by government agents in this case.... [Y]ou witnesses back in September received a letter from the prosecuting attorney [which stated in part]: 'Remember, anything you say to them,' that is, the defense lawyers or investigators, 'can be used to damage your credibility when you testify at trial.' Well, that doesn't present a fair picture of the role of witnesses.... There is an implication in those and other statements, in my determination, that witnesses in the case should be identified with the government.... 'A criminal trial, like its civil counterpart, is a quest for truth.' ... 'An accused and his counsel have rights of access to potential witnesses that are no less than their accessibility to the potential prosecutors.' ... I ask, previous to the trial of this case, ... that you reconsider [your refusal] in light of the principles that I have read to you.... You are not required to discuss the case in advance, but the whole trend and spirit of the criminal law in the last several years is to facilitate that."