965 F.2d 311
 61 USLW 2030
 UNITED STATES of America, Plaintiff-Appellee,
v.
ONE PARCEL OF LAND LOCATED AT 7326 HIGHWAY 45 NORTH, THREE
LAKES, ONEIDA COUNTY, WISCONSIN, Together With All
Appurtenances and Improvements Thereon, Defendant,
Appeal of Harry R. SEYMER, Dorothy B. Seymer, and
Modernaire, Inc., a Wisconsin corporation.
 No. 91-1617.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 2, 1991.
Decided June 2, 1992.
Rehearing and Rehearing En Banc
Denied Oct. 6, 1992.
 
 Steven Pray O'Connor, Asst. U.S. Atty. (argued), Madison, Wis., for plaintiff-appellee.
 Ralph A. Kalal (argued), Kalal & Habermehl, Madison, Wis., for appellants.
 Before POSNER and MANION, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.
 MANION, Circuit Judge.
 
 
 1
 Pursuant to 21 U.S.C. § 881(a)(7), the government filed a complaint for forfeiture in rem against a parcel of land located in Oneida County, Wisconsin, alleging that the property had been used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. §§ 801 et seq., punishable by more than one year's imprisonment. Modernaire Three, Inc. ("Modernaire"), owned the property in fee simple and contested the forfeiture in district court. After Modernaire and the government filed cross-motions for summary judgment, the district court granted the government's motion. Modernaire appeals claiming that the district court improperly rejected its innocent owner defense. We reverse and remand for entry of summary judgment in favor of Modernaire.
 
 I. Background
 
 2
 The parties agree that this case presents no material issues of fact. Since the legal issue presented focuses on the innocent owner defense, the relevant facts concern the ownership and operation of the res in this forfeiture action.
 
 
 3
 Incorporated in 1972, Modernaire owned the defendant property in a resort community in northern Wisconsin. The property consists of a parcel of land and five buildings: a tavern, a house, two cabins, and a garage. Only three individuals own stock in Modernaire. Harry R. Seymer, Jr., and his wife, Dorothy B. Seymer, own two-thirds of the shares. Their son, Harry R. Seymer, III ("Harry III"), owns the remaining one-third. Harry and Dorothy Seymer provided the original capital for Modernaire and for the purchase of the real estate by selling a tavern they owned personally, contributing $25,000, mortgaging other property, and mortgaging the property purchased. Harry III made no contribution to capitalize Modernaire or to purchase the property. Harry III's shares were a gift from his parents who wanted to provide their son with a start in life. Harry Seymer serves as president and Dorothy Seymer serves as vice-president of the corporation. Harry III served as corporate secretary-treasurer at all times relevant to this appeal.
 
 
 4
 From 1972 until the government seized the property in 1990, Harry III directed the day-to-day operations of the property and the tavern business. Between 1972 and 1977, Mr. and Mrs. Seymer lived in Milwaukee and would visit the property on weekends to check on business and help Harry III with maintenance, repairs and improvements. Before Modernaire purchased it, the property had been an auto court. The buildings had fallen into disrepair, so the Seymers would spend from Friday night through Sunday cleaning and repairing the premises. In 1977, Mr. and Mrs. Seymer moved to property next to the defendant property. In spite of a physical disability, Mr. Seymer visited the property daily spending anywhere from a half hour to the whole day doing ministerial and janitorial tasks. After being diagnosed with an aneurysm in 1979 at the age of 62, Mrs. Seymer was unable to participate in the day-to-day operations of the tavern but remained in touch with how it was run.
 
 
 5
 From the inception of Modernaire, Mr. and Mrs. Seymer attended informal monthly meetings and monitored Harry III's management of the business. They did rely on Harry III, however, to relay relevant financial information to them. Harry III had full authority to handle tax and financial matters and deal with vendors, government agencies, professionals and third parties on behalf of Modernaire. In exchange for managing the property, Harry III and his wife (also an employee of Modernaire) resided rent-free on the property and collected rental proceeds from a cabin on the premises. While the property no doubt appreciated over the years and the business grew (Harry III estimated that the annual gross income between 1980 and 1985 was around $70,000 or $80,000), Mr. and Mrs. Seymer apparently received no profit or dividends from Modernaire. Since the original purchase, however, Mr. Seymer invested approximately $25,000 more into the business. He had planned for Modernaire to sell the business eventually so that he could recover his investment and divide the proceeds with Mrs. Seymer and Harry III.
 
 
 6
 Without the knowledge or consent of Mr. or Mrs. Seymer, however, Harry III began engaging in drug transactions, some of which occurred on the defendant property. Federal and state agencies were suspicious of Harry III and began investigating him for drug-related activities in the early 1980s. A series of investigations by the Internal Revenue Service, the Oneida County Sheriff's Department, the Wisconsin Division of Criminal Investigations and the Federal Bureau of Investigation, however, failed to catch Harry III. The record indicates that Harry III conducted all of his drug transactions surreptitiously, particularly since he feared the wrath of his father, an ex-Marine. Concealing the drugs was not difficult since Harry III never possessed more than an ounce of cocaine at a time, and he would keep the drugs in his bedroom in a locking bank bag or in a safe. The record shows at the most three people who came to the defendant property to engage in drug transactions with Harry III.[1] Those transactions never took place in the bar but rather in Harry III's residence on the defendant property. Harry III even placed all phone calls related to his drug transactions from the phone in his residence. Harry III never used corporate funds to purchase drugs and never put any money obtained from drug sales into the corporation. His clandestine methods gave his parents no reason for suspicion and frustrated the extended investigation efforts of federal and state agencies.
 
 
 7
 Finally, in November 1989, the FBI interviewed Charles Richardson. Richardson stated that between the late 1970s and the mid-1980s Harry III bought large quantities of cocaine in Milwaukee for distribution, that Richardson had purchased cocaine from Harry III on several occasions, and that Richardson had sold cocaine for Harry III at locations other than the defendant property.
 
 
 8
 On April 5, 1990, the government filed its Complaint in this case alleging that Harry III had used the defendant property to facilitate a conspiracy to distribute controlled substances. In the Complaint, the government relied on the information that Richardson had supplied. On June 14, 1990, the court ordered the Clerk to issue a warrant for the seizure and arrest of the defendant property, and on July 19, Modernaire filed its Notice of Claim to the property. On December 6, 1990, in a separate criminal action, Harry III pleaded guilty to violations of 21 U.S.C. § 846 (conspiracy to distribute controlled substances) between the late 1970s and the mid-1980s. On December 14, 1990, both the government and Modernaire filed motions for summary judgment in this forfeiture action.
 
 
 9
 Both parties agreed that there were no material issues of fact, but Modernaire raised the innocent owner defense provided in 21 U.S.C. § 881(a)(7). Section 881(a)(7) provides for forfeiture to the United States of the following:
 
 
 10
 All real property, including any right, title, and interest (including any leasehold interest) in the whole of any lot or tract of land and any appurtenances or improvements, which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this title punishable by more than one year's imprisonment, except that no property shall be forfeited under this paragraph, to the extent of an interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner.
 
 
 11
 21 U.S.C. § 881(a)(7) (emphasis added). Modernaire argued that it qualified for the innocent owner exception of 21 U.S.C. § 881(a)(7) because Harry III's knowledge of his own activities could not be imputed to Modernaire.
 
 
 12
 The district court disagreed and granted summary judgment to the government for two reasons. First, because Modernaire had abdicated general corporate authority to Harry III, there was no limit on the extent to which Harry III's knowledge could be imputed to the corporation. Second, overseeing the premises was within the scope of Harry III's duties, and the knowledge he gained while carrying out his duties could be imputed to Modernaire.
 
 
 13
 On appeal, Modernaire asks us to resolve one question: Under 21 U.S.C. § 881(a)(7), can Harry III's knowledge of his own unauthorized criminal conduct be imputed to Modernaire to defeat the corporation's innocent owner defense?
 
 II. Analysis
 
 14
 We review a district court's entry of summary judgment de novo. Where the parties agree as to the material facts as they do in this case, we must determine if the moving party is entitled to judgment as a matter of law. E.g., First Wisconsin Trust Co. v. Schroud, 916 F.2d 394, 398 (7th Cir.1990); Fed.R.Civ.P. 56(c). Therefore, we will first examine the mechanics of the innocent owner defense and then apply those principles to the facts in this case.
 
 A. The Innocent Owner Defense
 
 15
 Under section 881(a)(7), once the government establishes probable cause to believe that property was used to facilitate the distribution of controlled substances in violation of Title II of the Controlled Substances Act, the burden shifts to the claimant to prove by a preponderance of the evidence either that the property was not used to facilitate the alleged illegal activity or that the claimant was an innocent owner. E.g., United States v. Parcel of Land & Residence at 28 Emery St., 914 F.2d 1, 3 (1st Cir.1990); United States v. 141st Street Corp. by Hersh, 911 F.2d 870, 876 (2d Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 1017, 112 L.Ed.2d 1099 (1991) (citing cases); cf. United States v. Single Family Residence, 803 F.2d 625, 629 (11th Cir.1986) (forfeiture under 21 U.S.C. § 881(a)(6)); United States v. Four Million, Two Hundred Fifty-Five Thousand, 762 F.2d 895 (11th Cir.), cert. denied, 474 U.S. 1056, 106 S.Ct. 795, 88 L.Ed.2d 772 (1985) (an analogous provision, 21 U.S.C. § 881(a)(6), places the burden of establishing the innocent owner defense on the claimant). Rather than dispute that Harry III used the defendant property to facilitate his drug transactions, Modernaire seeks the protection section 881(a)(7) affords to innocent owners.
 
 
 16
 To establish the innocent owner defense, the claimant must show by a preponderance of the evidence that the illegal activity took place on the property without the claimant's knowledge or consent. E.g., United States v. One Parcel of Real Property Known as 6109 Grubb Road, 886 F.2d 618, 626 (3d Cir.1989). Section 881(a)(7), however, harbors a latent ambiguity that has split the circuits. Some circuits hold that to avoid forfeiture a claimant must establish both lack of consent and lack of knowledge. Others hold that even if a claimant has actual knowledge, the claimant may avoid forfeiture by establishing lack of consent. See 141st Street Corp., 911 F.2d at 877-878 (collecting cases); United States v. 8848 South Commercial Street, Chicago, Ill., 757 F.Supp. 871, 886 (N.D.Ill.1990) (discussion of various circuits' positions). The Seventh Circuit has not taken a position on this issue, and we need not do so here. Since we conclude infra that Modernaire did not have actual knowledge of Harry III's activities, it logically follows that Modernaire could not consent. Thus we need not decide whether Modernaire could have established the innocent owner defense by showing that Modernaire did not consent to Harry III's activities even if it knew about them.
 
 
 17
 We also note that courts disagree about whether a claimant must prove not only that it did not know of or subjectively consent to the proscribed activity but also that it did all that he could reasonably be expected to do to prevent the proscribed use of the property. See 8848 South Commercial Street, 757 F.Supp. at 886 (discussing the split in the circuits); United States v. One Parcel of Real Estate Consisting of 4,657 Acres in Martin County, Florida, 730 F.Supp. 423, 426 (S.D.Fla.1989) (collecting cases in n. 9); compare, e.g., 141st Street Corp., 911 F.2d at 879 (holding that a claimant with knowledge of the illegal use of his property may defend on the basis of lack of consent but must show that he did all he reasonably could be expected to do to prevent the illegal use of his property) with United States v. Lots 12, 13, 14, and 15, Keeton Heights Subdivision, Morgan County, Ky., 869 F.2d 942, 946-47 (6th Cir.1989) (statute imposes no requirement that a person who claims the status of an innocent owner establish that he has done all that he could reasonably be expected to do to prevent the proscribed use of the property). This issue arises, however, as a subissue to the question of the claimant's consent to the illegal activity. Because we do not reach the issue of whether Modernaire consented, we need not decide whether consent is determined by subjective or objective criteria.
 
 B. Knowledge of a Corporation
 
 18
 Our inquiry must focus on Modernaire's knowledge. The language of section 881(a)(7) constrains courts to employ a subjective rather than an objective standard for assessing the claimant's knowledge. A claimant may secure the benefit of the innocent owner defense by establishing that the illegal conduct occurred on its property "without the knowledge or consent of" the claimant. Nothing in section 881(a)(7) suggests that the court must determine whether the claimant should have known of illegal activities taking place on the claimant's property. Instead, section 881(a)(7) focuses on the claimant's actual knowledge. United States v. Real Property & Improvements Located at 5000 Palmetto Drive, 928 F.2d 373, 375 (11th Cir.1991); United States v. $10,694 U.S. Currency, 828 F.2d 233, 234-35 (4th Cir.1987); Four Million Two Hundred Fifty-Five Thousand, 762 F.2d at 906.[2] Accordingly, if Modernaire shows that it had no actual knowledge of Harry III's activities, then the innocent owner defense shields Modernaire's property from forfeiture even if Modernaire conceivably should have known what Harry III was up to.
 
 
 19
 The task then becomes to ascertain the extent of Modernaire's actual knowledge, and therein lies the rub. As a legal fiction, a corporation cannot "know" like an individual "knows." We treat corporations as separate legal entities and enable them to own property and enter contracts by relying on agency precepts. A corporation and its agents relate to one another like a principal to its agents. A corporation acts through its agents. Similarly, a corporation "knows" through its agents. W. Fletcher, 3 Corporations § 787 (1986). But contrary to the government's contention, a corporate principal's knowledge is less than the collective knowledge of its corporate agents. To distinguish knowledge belonging exclusively to an agent from knowledge belonging to the corporate principal, courts rely on certain presumptions. Where a corporate agent obtains knowledge while acting in the scope of his agency, he presumably reports that knowledge to his corporate principal so the court imputes such knowledge to a corporation. However, where an agent obtains knowledge while acting outside the scope of his agency, the standard presumption is unfounded, and the court will not impute the agent's knowledge to the corporation. Id. at § 790 and § 793.
 
 
 20
 Corporate criminal and civil cases reflect the application of agency principles.[3] Only knowledge obtained by corporate employees acting within the scope of their employment is imputed to the corporation. See, e.g., United States v. Bank of New England, N.A., 821 F.2d 844, 856 (1st Cir.1987), cert. denied, 484 U.S. 943, 108 S.Ct. 328, 98 L.Ed.2d 356 (1987) (discussing general agency principles in the context of corporate criminal liability). Acting within the scope of employment entails more than being on the corporate employer's premises. This circuit has indicated that acting within the scope of employment means "with intent to benefit the employer." D & S Auto Parts, Inc. v. Schwartz, 838 F.2d 964, 967 (7th Cir.1988), cert. denied, 486 U.S. 1061, 108 S.Ct. 2833, 100 L.Ed.2d 933 (1988); accord United States v. Cincotta, 689 F.2d 238, 241-42 (1st Cir.1982), cert. denied sub nom. Zero v. United States, 459 U.S. 991, 103 S.Ct. 347, 74 L.Ed.2d 387 (1982) (acting within the scope of agency defined as acting as authorized and motivated at least in part by an intent to benefit the corporation). Therefore, the agent is outside the scope of his employment when he is not acting at least in part for the benefit of the corporation, and any knowledge the agent obtains is not imputed to the corporation. Other cases divide the analysis differently and reason that knowledge is imputed only if the agent is acting within the scope of his employment and for the benefit of the employer. E.g., Grand Union Co. v. United States, 696 F.2d 888 (11th Cir.1983) (in a False Claims Act case, knowledge of employee is imputed to corporation when employee acts for the benefit of the corporation and within the scope of his employment); accord Fletcher at § 819 ("[K]nowledge of a corporate officer or agent acquired outside the scope of his or her powers or duties or when not acting for or in behalf of the corporation[ ] is not imputable to the corporation."). In any event, the knowledge that a corporate agent acquires while not acting at least in part with the intent to benefit the corporation is not imputed to the corporation.
 
 
 21
 Relying on these general principles of agency and their underlying presumptions, we will not impute Harry III's knowledge of his own illegal activities to Modernaire in spite of the extent of Harry III's authority. Harry III was dealing drugs to benefit Harry III not as part of his job at Modernaire. Harry III testified that no proceeds of his illegal conduct went to Modernaire in any way, and the government offered no conflicting evidence. Harry III's interest indisputably lay in concealing his own drug deals from Modernaire thus undermining the presumption that an agent reports his knowledge to his principal. Consequently, we will not mechanically attribute Harry III's knowledge of his own drug deals to Modernaire to defeat Modernaire's innocent owner defense. Cf. 4,657 Acres in Martin County, Florida, 730 F.Supp. at 426-27 (Where a corporate agent allowed a plane carrying narcotics to land on corporate property as part of a drug trafficking enterprise, the corporate agent's knowledge was not imputed to the corporation because the agent was not acting for the benefit of the corporation.).[4]
 
 
 22
 After examining the general principles of agency law, the government reached a contrary conclusion in this case. Jumping to the conclusion that Harry III's knowledge could be attributed to Modernaire simply because of the extent of Harry III's authority, the government discussed the adverse agent exception to the imputation of knowledge and explained that Modernaire could not qualify. Under the adverse agent exception, where an agent is involved in matters damaging to the corporation, his knowledge is not imputed to the corporation even if he obtains the knowledge while acting within the scope of his agency because the presumption that the agent will report information of his activities to the corporation is invalid. Id. at § 819; also see, e.g., First National Bank of Cicero v. Lewco Securities Corp., 860 F.2d 1407, 1417 (7th Cir.1988) (discussing adverse agent exception). The government contends that Harry III's activities were not adverse to Modernaire. The government need not have considered the adverse agent exception, however, because the general rule disposed of the issue in this case. Regardless of whether Harry III constituted an "adverse agent," Harry III did not deal drugs with the intent to benefit Modernaire in any way. Therefore, notwithstanding the extent of Harry III's authority, since Harry III did not obtain knowledge of his activities while acting to benefit his principal, his knowledge cannot be imputed to Modernaire.
 
 
 23
 Similarly, we find the government's argument regarding the "sole actor" exception superfluous. The sole actor exception functions as an exception to the adverse agent exception. "Where an adverse agent is also the sole representative of the principal in the transaction in question, the principal may once again be charged with the agent's knowledge." First National Bank of Cicero, 860 F.2d at 1417 (citing 3 W. Fletcher, Corporations § 827, at 153-62 (1975)). Through the sole actor exception, courts protect third parties who unwittingly deal with adverse agents if the corporation abdicated responsibility to the adverse agent. See id. at 1417-18. The sole actor exception to the adverse agent exception has no place in our analysis since we need not reach the adverse agent exception itself. Furthermore, since we do not have an innocent third party injured by an unsupervised adverse agent, we need not engage in the equity considerations that the sole actor exception addresses. Cf. Ash v. Georgia-Pacific Corp., 957 F.2d 432, 436 (7th Cir.1992) (sole actor exception is designed to protect innocent third parties).
 
 
 24
 The Second Circuit's opinion in 141st Street Corp. does not conflict with our analysis. In 141st Street Corp., the government instituted a civil forfeiture action pursuant to section 881(a)(7) against an apartment building where drug traffickers regularly conducted business. The building's corporate owner raised the innocent owner defense. The corporate president had received repeated police warnings and tenant complaints about the drug activity in the building. The building's superintendent knew about the narcotics trafficking; but since the superintendent accepted bribes from the drug dealers, the corporation argued that the superintendent was an adverse agent and his knowledge could not be imputed to the corporation. The Second Circuit rejected the corporation's argument and imputed the superintendent's knowledge because the superintendent's actions were adverse to the corporation "only in the sense that his actions contributed to the imputation of knowledge to Realty Corp. ..." while the corporation presumably benefitted from the "exorbitant rents" that the superintendent charged for the apartments. 141st Street Corp., 911 F.2d at 876. The court stated that it "might view the matter differently" if the claimant corporation had offered evidence that the corporation did not share in the superintendent's profits. Id. Furthermore, the corporation could not dispute that the corporate president's knowledge was chargeable to the corporation. Id. at 877.
 
 
 25
 This case differs from 141st Street in two significant ways. First, unlike the corporation in 141st Street, Modernaire derived no benefit from Harry III's activities. Harry III offered undisputed testimony that he did not turn over any money from his drug activities to Modernaire. Although the government argued that Modernaire benefitted because Harry III's drug customers probably bought drinks at the tavern when they came to purchase drugs, this indirect and highly speculative benefit fails to liken this case to 141st Street. Since Harry III did not obtain knowledge of the illegal activity while acting as an agent for the benefit of his corporate principal, his knowledge cannot be imputed to Modernaire. Second, unlike the corporation in 141st Street, Modernaire's officers who were independent of the illegal activity knew nothing of Harry III's unauthorized activities. Nothing in the testimony of the FBI agent who investigated Harry III indicated Mr. or Mrs. Seymer had any involvement or knowledge of Harry III's drug-related activities. Although the investigation of Harry III was carried on throughout the 1980's, Mr. and Mrs. Seymer's undisputed testimony established that they never received any indication from authorities or from any other source that Harry III was conducting drug transactions at all, let alone drug transactions facilitated by the defendant property. Therefore, unlike the Second Circuit in 141st Street, we do not have an alternative means of imputing knowledge to the corporation.
 
 
 26
 Since we cannot attribute Harry III's knowledge to Modernaire through the application of agency principles, Modernaire has no actual knowledge of proscribed activities facilitated by the defendant property. Accordingly, Modernaire has established by a preponderance of the evidence that it is an innocent owner, and the government may not appropriate Modernaire's property. Even if a court concluded Modernaire should have known through Mr. or Mrs. Seymer that Harry III sold drugs from his residence on the defendant property, that finding would be irrelevant. Section 881(a)(7) demands actual knowledge not constructive knowledge. Therefore, Modernaire had to show only what was, and we need not consider what should have been.
 
 
 27
 We likewise find the dissent's consideration of Harry III's apparent authority inappropriate. "Apparent authority" is a vehicle by which a principal is held vicariously liable to an innocent third party for injury resulting from the misrepresentations or misdeeds of the principal's agent who acted with apparent authority from the principal. E.g., United States v. O'Connell, 890 F.2d 563, 568 (1st Cir.1989); In re Atlantic Financial Management, Inc., 784 F.2d 29, 31-32 (1st Cir.1986), cert. denied sub nom., AZL Resources Inc. v. Margaret Hall Found., Inc., 481 U.S. 1072, 107 S.Ct. 2469, 95 L.Ed.2d 877 (1987). In a fraud case, for example, a principal is liable for fraud upon a third person committed by an agent acting with apparent authority. "Liability is based upon the fact that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him." Restatement (Second) of Agency § 261, Comment a, at p. 571.
 
 
 28
 As the Supreme Court explained in American Soc'y of Mechanical Eng'r, Inc. v. Hydrolevel Corp., 456 U.S. 556, 565-67, 102 S.Ct. 1935, 1942-43, 72 L.Ed.2d 330 (1982), principals are liable when their agents act with apparent authority and commit torts even if the principal derives no benefit from the agent's actions and even if the agent acts entirely for his own purposes. Accord Restatement (Second) of Agency §§ 261 and 262. In Hydrolevel, for example, the chairman of a committee responsible for issuing certain safety codes for the American Society of Mechanical Engineers acceded to the request of one of the plaintiff's competitors and declared in a letter written on official stationery that the plaintiff's product was unsafe. The plaintiff's competitor then used the letter to discourage customers from buying the plaintiff's products. The Supreme Court held that even though it did not benefit from or approve the letter, the American Society of Mechanical Engineers could be held liable under the Sherman Act because its agent had acted with apparent authority. Id. at 577, 102 S.Ct. at 1948.
 
 
 29
 The record in this case provides no indication that Harry III purported to act under the apparent authority of his corporate principal, Modernaire, or that any third party thought that Harry III sold drugs as part of his regular duties for Modernaire. The dissent contends that "the fact that Harry III appeared to be--in fact, was--in control of the resort property made persons in quest of illegal drugs more willing to buy from him than if they had thought him a mere tenant trying to conceal his illegal drug dealings from his landlord and his landlord's agents as well as from the police." The record provides no support for this speculation. Furthermore, the question is not whether a third party would think the agent's position would facilitate his activities but whether to a third party the agent "appears to be acting in the ordinary course of the business provided to him." Restatement (Second) of Agency § 261. If we were permitted to speculate as the dissent has, it would seem unlikely that the three individuals who came to the property to conduct drug business with Harry III at his residence thought that Harry III's activities were part of his regular duties as an agent of Modernaire.
 
 
 30
 More important, however, the apparent authority doctrine should not enter into a section 881(a)(7) analysis. Apparent authority does not impute actual knowledge to a principal. Instead, it saddles the principal with vicarious liability for the misdeeds of an agent in spite of the principal's lack of knowledge. In effect, it is a principle of strict liability.
 
 
 31
 Principals are strictly liable for their agents' acts ... if the principals authorize or ... even just create an appearance that the acts are authorized. This is so even though in a case of ratification or apparent authority the principal does not himself direct the act and may indeed know nothing about it when it occurs.
 
 
 32
 Rosenthal & Co. v. Commodity Futures Trading Comm'n, 802 F.2d 963, 966 (7th Cir.1986) (Posner, J.) (emphasis added). As explained above, section 881(a)(7)'s innocent owner defense specifically extends to any owner who does not have actual knowledge that its property is being used to commit or facilitate the commission of a violation of the Title II of the Controlled Substances Act. Therefore, our analysis focused on the ways in which corporations have been deemed to have knowledge, not the ways in which they have been held strictly liable for their agents' actions. Congress could rewrite section 881(a)(7) and hold owners strictly liable for activities on their property, but until it does we decline to do so.
 
 C. Other Considerations
 
 33
 Congress intended to use the forfeiture statutes as a powerful weapon in the war on drugs. S.Rep. No. 225, 98th Cong., 2d Sess. 191-192, reprinted in 1984 U.S.Code Cong. & Admin. News 3182, 3374-75 (1985). "Clearly if law enforcement efforts to combat racketeering and drug trafficking are to be successful, they must include an attack on the economic aspects of these crimes. Forfeiture is the mechanism through which such an attack may be made." Id. at 3374. Nothing in this opinion should vitiate the intended use of forfeiture statutes. The result in this case turns closely on the facts. If the corporation had derived more than a speculative benefit from the drug transactions, then we could have imputed Harry III's knowledge of his activities to Modernaire. If the corporation was Harry III's alter ego, if Harry III established the corporation to serve his drug business, or if Harry III had given title to the property to the corporation in order to protect his assets, cf. United States v. A Single Family Residence and Real Property Located at 900 Rio Vista Blvd., Fort Lauderdale, 803 F.2d 625 (11th Cir.1990) (drug trafficker protected assets in sham corporation), then we could have imputed Harry III's knowledge of his drug dealings to the corporation. But here a corporation has presented undisputed evidence that its corporate agent surreptitiously conducted his own drug deals with no ties to the legitimately established corporation except that three individuals purchased drugs at some time on corporate property. The corporation has established the innocent owner defense because the agent's knowledge of his own illegal activities was obtained while the agent was acting outside the scope of his agency and cannot be imputed to the corporation. Therefore, the corporation need not forfeit the property in the name of the war on drugs.[5]
 
 III. Conclusion
 
 34
 For the foregoing reasons, the district court's grant of summary judgment is REVERSED and the case is REMANDED for entry of summary judgment for Modernaire.
 
 
 35
 POSNER, Circuit Judge, dissenting.
 
 
 36
 Harry R. Seymer, III dealt drugs on a resort property owned by Modernaire Three, Inc., a corporation of which he is a one-third owner and the manager. The other two owners are his parents. They play no active role in the management of the corporation. It's Harry III's baby. The property was forfeit, unless the drug dealings were committed "without the knowledge or consent of [the property's] owner." 21 U.S.C. § 881(a)(7). The owner of course was Modernaire. My brethren are correct that a corporation is not to be charged with knowledge of every furtive misdeed of employees who misuse corporate property for ends not only private but contrary to the corporation's interest. Ash v. Georgia-Pacific Corp., 957 F.2d 432, 436 (7th Cir.1992); United States v. Smith, 810 F.2d 996, 998 (10th Cir.1987); Bates v. United States, 701 F.2d 737, 741-42 (8th Cir.1983); United States v. Cincotta, 689 F.2d 238, 242 (1st Cir.1982). But Harry III was not only a corporate officer and major shareholder; he was the manager of the corporation--the only manager. He controlled the use of its property. If he decided to turn the corporation into a criminal enterprise--as he did, using the stream of legitimate visitors to the tavern on the property to mask his drug business--there was, as a practical matter, no one to say him nay.
 
 
 37
 What the court has done is to pierce the corporate veil and deem the parents the owners of the property that Harry III used for drug trafficking. But they are not the owners; the corporation is. And if the veil is to be pierced, the spear should touch Harry, for he is one of the owners: one might have supposed that, at the least, Harry III would be required to forfeit his one-third interest. Cf. Cenco Inc. v. Seidman & Seidman, 686 F.2d 449, 454-56 (7th Cir.1982). But no; he forfeits nothing. At argument Modernaire's lawyer said that the case should be decided the same way even if Harry had had a two-thirds rather than a one-third share. Why stop there? On the logic of the court's opinion Modernaire would win this case even if Harry owned all the corporation's stock.
 
 
 38
 Yet at the end of its opinion the court flinches, and tries to reassure us that "nothing in this opinion should vitiate the intended use of forfeiture statutes" because Congress could rewrite the statute and anyway "the result in this case turns closely on the facts." What facts? That Harry III's parents, people of modest means, mortgaged their property so that they could "provide their son with a start in life" that he did not deserve? That Harry III's father had a physical disability and his mother an aneurysm? That there were only three drug buyers? (I don't believe it and neither should the court, which, while emphasizing that Harry III's "clandestine methods frustrated the extended investigation efforts of federal and state agencies," credulously accepts his deposition evidence concerning the limited scope of his operations.) That the other stockholders didn't know? That the government neglected to prove what is obvious without proof, that the tavern was a convenient cover for Harry III's drug business?
 
 
 39
 The court is critical of fictions but says without blushing that "Modernaire has no actual knowledge of proscribed activities taking place on its land." We must ask what it means to speak of a corporation's "knowledge." A corporation is not a living being. It has no mind. When we say a corporation "knows" something, for example that it has a claim against someone (and hence that the statute of limitations is running), we mean that a responsible agent of the corporation knows the thing. Peterson v. Sealed Air Corp., 902 F.2d 1232, 1236 (7th Cir.1990). There is no more responsible agent of Modernaire than Harry, its manager. If he knew that Modernaire had a claim against someone, the corporation could not defeat a defense of statute of limitations on the ground that Harry's knowledge could not be imputed to the corporation. Likewise the drug dealing of Harry the employee was, of course, known to Harry the manager, the responsible agent, and this knowledge the law treats as the knowledge of the corporation. The court says that "where a corporate agent obtains knowledge while acting in the scope of his agency, he presumably reports that knowledge to his corporate principal so the court imputes such knowledge to a corporation." We must be alert to the fallacy of personifying the corporation and ask what concretely it means to report to one's "corporate principal." Necessarily the agent reports not to "the corporation" but to a human being--in fact to another corporate agent, but one at the management level. Harry the drug dealer "reported" his drug dealings to Harry the corporate manager. No more was necessary to "impute such knowledge to [the] corporation" under the formula that my brethren quote.
 
 
 40
 It is not surprising that the court wants to shift the plane of analysis from whether Modernaire is to be deemed to have known of Harry's drug dealings to whether, if prosecuted for a criminal offense, Modernaire would be guilty in the absence of proof that the crime had been committed for the corporation's benefit. That is not the issue but let me go along with the court far enough to suppose that Harry III's criminal proclivities ran to monopolizing rather than to drug trafficking and that Modernaire were prosecuted for a criminal violation of the antitrust laws. If the government proved that Harry III had caused Modernaire to engage in a monopolistic practice, Modernaire would be found guilty and forced to pay what might be a ruinous fine, but the black-letter rule of corporate criminality would require the government to prove that Harry III had in some, though perhaps only a very attenuated, sense been acting "for the benefit of the corporation" (even if his action was contrary to corporate directives). United States v. Paccione, 949 F.2d 1183, 1200 (2d Cir.1991); Genty v. Resolution Trust Corp., 937 F.2d 899, 909 (3d Cir.1991); United States v. Basic Construction Co., 711 F.2d 570, 573 (4th Cir.1983) (per curiam); United States v. Cincotta, 689 F.2d 238, 242 (1st Cir.1982); United States v. Koppers Co., 652 F.2d 290, 298 (2d Cir.1981); United States v. Van Riper, 154 F.2d 492 (3d Cir.1946); Developments in the Law, "Corporate Crime: Regulating Corporate Behavior Through Criminal Sanctions," 92 Harv.L.Rev. 1227, 1247-51 (1979).
 
 
 41
 The court clings to this principle. But the statute here is different. For one thing it is not a criminal statute, and in a civil antitrust case, or for that matter any other civil case, the plaintiff need not show that the corporation's agent acted with an intent to benefit the corporation. American Society of Mechanical Engineers v. Hydrolevel Corp., 456 U.S. 556, 573-74, 102 S.Ct. 1935, 1946, 72 L.Ed.2d 330 (1982); In re American Biomaterials Corp., 954 F.2d 919, 923-24 (3d Cir.1992); United States v. O'Connell, 890 F.2d 563, 568-69 (1st Cir.1989); In re Atlantic Financial Management, Inc., 784 F.2d 29 (1st Cir.1986). These cases emphasize the agent's "apparent authority": "the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business provided to him." Restatement (Second) of Agency § 261, comment a, at p. 571 (1958), quoted in American Society of Mechanical Engineers v. Hydrolevel Corp., supra, 456 U.S. at 566, 102 S.Ct. at 1942. This is not a fraud case, but neither was Hydrolevel; it was a boycott case. Apparent authority can facilitate wrongdoing other than just that of the fraudulent variety. No doubt the fact that Harry III appeared to be--in fact, was--in control of the resort property made persons in quest of illegal drugs more willing to buy from him than they would have been had they thought him a mere tenant trying to conceal his illegal drug dealings from his landlord and his landlord's agents as well as from the police. The majority opinion derides this point as speculative, but judges need not put off their common sense when they put on their robes.
 
 
 42
 I have strayed from the central point, which is that the property was forfeit regardless of the motives or apparent authority of the person actually responsible for putting it to a criminal use, subject to a defense if the owner did not know of or consent to that use--and Harry on behalf of the corporation of which he was the manager and one-third owner knew and consented. The court has confused criminal cases in which a prosecutor must establish the liability of the corporation and to that end prove that the crime was committed on the corporation's behalf with civil cases under a forfeiture statute under which liability is presumed and the corporation must prove its innocence. All that we must--all that we may--consider is whether Harry's misconduct fits the defense. It does not, because his misconduct was known to and consented to by the corporation's responsible agent--Harry himself.
 
 
 43
 But it is a fair question to ask me what rule I would apply to this case. A simple rule springs to mind: a corporation is not an innocent owner within the meaning of the forfeiture statute if an officer of the corporation causes its property to be used in drug trafficking. It may be too simple. Suppose Harry III were an officer of General Motors and sold cocaine from his office. Would all the assets of General Motors be forfeited to the government? Surely not. The norm of proportionality of sanctions, whether or not it has any constitutional provenance or dignity, would require a limiting interpretation. So would the sheer arbitrariness of corporate organization--the size of the forfeiture in my hypothetical case might depend on whether General Motors was organized in divisions or corporate subsidiaries.
 
 
 44
 I do not have a clear idea of the form the necessary limiting interpretation would take. But I know this: if the sole manager and one-third owner of a corporation deals drugs from the corporate premises the corporation is not innocent even if the other shareholders have health problems. And I fear that if this decision stands, the cannier drug dealers will rush to incorporate in order to protect their assets. I take it that my brethren would permit that unless the government undertook to prove a specific intent to evade the statute.
 
 
 
 [1]
 The dissent states that Harry III turned the corporation into a "criminal enterprise ... using the stream of visitors to the tavern on the property to mask his drug business...." The record does not support this characterization. In his deposition, Harry III recalled that only Charles Richardson had come to his residence (located on the defendant property) to purchase or exchange drugs. The FBI agent who had investigated Harry III could identify only two other individuals who visited the defendant property for drug transactions. Although the Assistant United States Attorney who questioned Harry III alluded to other transactions, there is no testimony regarding those transactions from either the FBI agent or Harry III. Furthermore, although some of the deposition testimony suggests that Harry III may have carried on transactions at other locations, the only transactions relevant to this forfeiture action are those facilitated by the defendant property
 
 
 [2]
 We agree with the Eleventh Circuit that nothing in Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974) contravenes this conclusion. Four Million, Two Hundred Fifty-Five Thousand, 762 F.2d at 906 n. 24. Calero-Toledo involved a due process challenge to forfeiture. In dicta, the Supreme Court suggested that it might be difficult to reject the constitutional claim of an innocent owner who not only was uninvolved in and unaware of the wrongful activity but also has done "all that reasonably could be expected to prevent the proscribed use of his property...." Calero-Toledo, 416 U.S. at 689, 94 S.Ct. at 2095. The Supreme Court's musings on the protection against forfeiture afforded to property owners by the due process clause do not prevent Congress from offering an innocent owner defense to those without actual knowledge rather than just to those without actual or constructive knowledge
 
 
 [3]
 Granted, the forfeiture statute at issue in our case is not a criminal statute, and the government has not attempted to hold Modernaire criminally liable for Harry III's drug transactions. Nevertheless, we are focusing on Modernaire's knowledge, and the issue of corporate knowledge usually arises in criminal cases. The agency principles employed, however, are equally valid in a civil case
 
 
 [4]
 The dissent looks at Harry III as wearing two hats, drug dealer and corporate manager, and then concludes: "Harry the drug dealer 'reported' his drug dealings to Harry the corporate manager. No more was necessary" to impute Harry's knowledge to the corporation. We perceive this case differently. There was not a Harry III "corporate manager" to receive reports from Harry III "drug dealer." Harry III knew about the drug deals not because he was a corporate manager acting within the scope of his employment but only because he was acting outside the scope of his employment. Since Harry III did not gain his knowledge of the drug deals while acting within the scope of his employment for the benefit of his corporate principal, the law does not impute that knowledge to the corporation
 
 
 [5]
 The dissent maintains that the court has "pierced the corporate veil" and deemed Mr. and Mrs. Seymer to be the owners of the property. On the contrary, our analysis has preserved the corporation as a separate legal entity and drawn a distinction between Harry III's knowledge and Modernaire's knowledge. By contrast, the dissent has effectively treated the corporation as Harry III's alter ego and disregarded the corporate form. In appropriate circumstances, a corporation may be treated as the alter ego of its individual shareholders. See, e.g., Esmark, Inc. v. NLRB, 887 F.2d 739, 753 (7th Cir.1989) (a shareholder is not responsible for corporate obligations unless the shareholder exercised complete domination over the corporation's decisionmaking, treating the corporation as a mere instrumentality to advance the shareholder's personal interest); Chicago Florsheim Shoe Co. v. Cluett, Peabody & Co., Inc., 826 F.2d 725, 728 (7th Cir.1987) (same interpreting Illinois law); Van Dorn Co. v. Future Chemical and Oil Corp., 753 F.2d 565, 570 (7th Cir.1985) (same). But the dissent has not provided the rationale for discarding the corporate form in this case
 The dissent would make the corporation's knowledge commensurate with any manager's knowledge by imputing any manager's knowledge of his own activities to his corporate principal. Even the dissent, however, recognizes that such a formula could lead to rather draconian results: "Suppose Harry III were an officer of General Motors and sold cocaine from his office. Would all the assets of General Motors be forfeited to the government? Surely not." But why "surely not"? The only limiting principle the dissent offers is the "norm of proportionality of sanctions." Does that mean GM forfeits only the assets directly controlled by that officer? And wouldn't it matter that the officer secretly used the facility to pad his own pocket, with no benefit to GM? The hopelessly vague standard proposed by the dissent would provide no guidance to the district court. We think it is preferable to instruct district courts to impose the forfeiture sanction Congress chose in section 881 and to employ the well-developed principles of agency law in ascertaining a corporation's knowledge in the context of the innocent owner defense.