**UNITED STATES of America,**
**Plaintiff, Appellee,**

v.

**John A. O'CONNELL, Jr., et al.,**
**Defendants, Appellees,**

**Appeal of ST. AUGUSTINE TRAWLER,**
**INC., Defendant.**

No. 89–1207.

United States Court of Appeals,
First Circuit.

Heard Sept. 12, 1989.

Decided Dec. 6, 1989.

**564**

Fred H. Kent, Jr., with whom Kent, Hayden, Facciolo & McMorrow, Jacksonville, Fla., and Kneeland, Kydd & Handy, Boston, Mass., were on brief, for appellant.

Robert L. Vogel with whom Stuart E. Schiffer, Acting Asst. Atty. Gen., Washington, D.C., Wayne A. Budd, U.S. Atty., Boston, Mass., and Michael F. Hertz, New York City, were on brief, for plaintiffs, appellees.

Before BOWNES, TORRUELLA and MAYER [*] Circuit Judges.

BOWNES, Circuit Judge.

This is an appeal by defendant-appellant St. Augustine Trawlers, Inc. (SAT) from a summary judgment granted against it, John A. O'Connell and Jerry D. Thompson. A default judgment was entered against a fourth defendant, James H. Norton, Jr. The defendants were held liable under the False Claims Act, 31 U.S.C. §§ 3729–3733, for defrauding the government of about $463,000. The district court held SAT responsible for the acts of its general manager and one third owner, Thompson. Only SAT has appealed. SAT does not deny that Thompson helped the other individual de-

[*] Of the Federal Circuit, sitting by designation.

fendants defraud the government. The main thrust of its appeal is that there were genuine issues of material fact to be determined by trial and as a matter of law SAT was not liable.

## I. THE FRAUD

The fraud was conceived, hatched and perpetrated by O'Connell, Norton and Thompson. Prior to the bringing of this case, O'Connell and Norton were convicted of conspiracy to defraud the United States Department of Housing and Urban Development (HUD), making false material declarations before the Grand Jury, influencing, obstructing and impeding the due process of justice, and obstructing a witness, in violation of 18 U.S.C. §§ 371, 1503, 1623 and 2. The convictions were upheld by the Eleventh Circuit. *United States v. Norton and O'Connell*, 755 F.2d 1428 (11th Cir. 1985). Thompson pled guilty to one count of conspiracy to defraud HUD, 18 U.S.C. § 371. He was a witness at the trial. The facts that form the basis for this action are the same the government relied upon to prove a conspiracy to defraud HUD in the criminal case.

We now turn to the facts that the government claims are not in dispute. These facts are derived from the materials submitted by the government in support of its motion for summary judgment. These materials, in the main, consist of exhibits and excerpts of testimony from the criminal trial of O'Connell and Norton, in which Thompson was a witness. SAT does not contest the accuracy of the facts but challenges their use by the district court and the legal conclusions drawn from them.

The fraud began in September of 1979 when O'Connell contacted the Massachusetts Economic Development and Industrial Corporation (EDIC) about leasing and developing Boston waterfront property. In January of 1980, the O'Connell Seafood Company (OSC), a company owned and controlled by O'Connell, applied to HUD for a grant in the amount of $2,087,250 from its Urban Development Action Grant Pro-

gram. The grant was to be used by OSC for certain improvements to Boston Harbor including the construction and installation of a floating dry dock and the construction of nine fishing boats to be berthed in the harbor. OSC received the grant. It was administered by EDIC and was conditioned on the investment by OSC of at least $150,000 of its own funds towards the construction of the dry dock and not less than $6,579,000 for the building of the fishing vessels.

Our focus is on the financial transactions between OSC and SAT. It is important to bear in mind that throughout this skein of transactions SAT acted solely through its general manager, Thompson.

In April, OSC and SAT signed an agreement that provided that SAT would build the dry dock and sell it to OSC for $890,000. This agreement was false; the amount actually paid by OSC to SAT was about $425,000. These particular facts are based on the testimony of Thompson at the criminal trial and notations he had made. It is not clear from Thompson's testimony whether the false agreement was for $790,000 or $890,000 but SAT has not challenged the amount claimed by the government, $890,000, so we assume it is correct.

In May, O'Connell gave Thompson two OSC checks made payable to SAT in the amounts of $2,000 and $150,000. Thompson in turn gave O'Connell false SAT invoices confirming these two payments, and at the same time gave O'Connell a SAT check for $152,000 payable to OSC. Copies of the OSC checks given to SAT were furnished by O'Connell to EDIC and then forwarded to HUD. In June, Norton, as general counsel to OSC, wrote a letter to HUD stating that OSC had entered into a valid and legally enforceable contract with SAT for the construction of the dry dock at a price of $890,000 and that OSC had paid SAT $152,000 on the dry dock contract.

In July, O'Connell gave EDIC a false SAT invoice which stated that $300,000 was due and owing on the dry dock. EDIC then disbursed $300,000 in reliance on the false invoice. In August, O'Connell gave Thompson an OSC check for $300,000 payable to SAT in partial payment for the dry dock. Thompson in turn gave O'Connell four SAT checks for $50,000 each, purportedly for sales commissions due him on four of the fishing boats. In fact, these checks were issued to cover up the fact that O'Connell had pocketed $200,000 of federal money; no commissions were due O'Connell.

In September, O'Connell presented another false SAT invoice to EDIC requesting a final payment on the dry dock of $438,000. In October and November, EDIC disbursed that amount to OSC in reliance on the false invoice.

In response to O'Connell's false claims for payments and in reliance on the fraudulent documentation, EDIC paid out a total of $738,000 in HUD funds to OSC. The dry dock had only cost OSC about $425,000 and OSC had not invested, as it agreed, $150,000 of its own money towards the construction of the dry dock. As a result the government was defrauded of about $463,000. Under the False Claims Act, that amount is tripled and each defendant is jointly and severally liable. 31 U.S.C. § 3729(a).

## II. SUMMARY JUDGMENT

In reviewing a grant of summary judgment by the district court, we look to the pleadings and supporting materials submitted by the parties in order to determine whether or not an issue exists that requires a trial for its resolution. Fed.R.Civ.P. 56(c); *Daury v. Smith*, 842 F.2d 9, 11 (1st Cir.1988); *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). The inferences to be drawn from the underlying facts contained in the materials submitted by the moving party must be viewed in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Hahn v. Sargent*, 523 F.2d at 464. If the moving party has met its initial burden, the opposing party may not rely on a general denial as the basis for a favorable inference; it "must set forth *specific facts* showing that

there is a genuine issue for trial." Fed.R. Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *Daury v. Smith*, 842 F.2d at 11. As the Court has said: "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986) (footnote omitted). The test for whether an opposing party has established a genuine issue for trial is whether it "present[s] evidence from which a jury might return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 257, 106 S.Ct. at 2515; *Daury v. Smith*, 842 F.2d at 11.

Having set forth the standard of review, we turn to SAT's contentions.

### A. The Pleading Argument.

SAT's first contention is outright frivolous. It claims that because the government did not state explicitly within the four corners of its motion for summary judgment that there were no genuine issues of material fact, the motion was fatally defective. Along with its motion for summary judgment, the government filed a 20 page document entitled "Statement of Material Facts That are Not In Dispute." This document was incorporated by reference in the motion. SAT tries to avoid the consequences of this by arguing that the statement was provided in compliance with local rule 18 of the Massachusetts District Court, and it, therefore, does not cure the failure to comply with Fed.R.Civ.P. 56.

■ There is no requirement in Rule 56 that a motion for summary judgment state explicitly that there are no genuine issues of material fact. This is the basis for a motion for summary judgment. The very filing of a motion for summary judgment amounts to a statement that the proponent is claiming that there are no issues of material fact. That is what Rule 56 is all about. Rule 56(c) states in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions,

answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Moreover, SAT cites no authority for its contention. It cites a single case at the end of its argument on this issue, *Berard v. General Motors Corp*, 493 F.Supp. 1035, 1037 (D.C.Mass.), *aff'd without opinion*, 657 F.2d 261 (1st Cir.1980), *cert. denied*, 451 U.S. 987, 101 S.Ct. 2322, 68 L.Ed.2d 845 (1981). But there is nothing in *Berard* that could remotely be connected to the argument advanced by SAT.

By forcing us to deal with a frivolous issue at the outset and citing a case that lends no support to its contention, SAT has considerably diminished its credibility.

### B. The Admissibility of the Exhibits and Testimony Excerpts.

SAT attacks the exhibits, testimony excerpts and other materials submitted by the government on the ground that they would be inadmissible at trial and, hence, the district court should not have considered them. Specifically, it objects to copies of the fraudulent SAT invoices and to excerpts of Thompson's testimony at the criminal trial of O'Connell and Norton. Under Rule 56(e), the facts set forth in the affidavits must be "admissible in evidence" before they can be considered by the court in a summary judgment determination. The rule provides in pertinent part: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

■ We turn first to the false invoices. They were identified and authenticated in an affidavit submitted by the Director of Special Projects for EDIC as being accurate copies of the documents in the EDIC files. SAT does not dispute the personal knowledge or competency of the affiant. It contends that the invoices "only have the

appearance of being part of SAT's records" and are inadmissible hearsay. Both contentions are woefully wide of the mark. The government did not claim that the invoices were part of SAT's records; they were false invoices submitted to EDIC for the purpose of obtaining money for the benefit of O'Connell, Norton and Thompson. The invoices would be admissible in evidence, as part of the business records of EDIC, to show that false claims had been made against an agency of the United States. They also would be admissible under Fed.R.Evid. 801(d)(2)(E).[1]

■ SAT's objection to the trial testimony of Thompson deserves but short shrift. This circuit has held that because depositions and answers to interrogatories may be considered on a motion for summary judgment,

> there is no sensible rationale which would preclude reliance on sworn testimony faithfully recorded during the conduct of a judicially-supervised adversarial proceeding. All of the hallmarks of reliability attend upon such trial transcripts. *See, e.g., Fisher v. Shamburg,* 624 F.2d 156, 162 n. 7 (10th Cir.1980) (though summary judgment was improper on other grounds, trial court properly considered the transcript of the defendant's earlier criminal trial); *Askew v. Bloemaker,* 548 F.2d 673, 679 (7th Cir.1976) (district court may properly consider a certified transcript on a motion for summary judgment); *Langston v. Johnson,* 478 F.2d 915, 917 n. 17 (D.C.Cir.1973) (collecting cases).

*Advance Financial Corp. v. Isla Rica Sales, Inc.,* 747 F.2d 21, 27 (1st Cir.1984). We conclude that the district court properly considered the exhibits and trial testimony excerpts in determining that there were no genuine issues of material fact and we affirm that ruling. In so doing we point out again that SAT has not challenged the facts set forth in the exhibits or trial testimony as prescribed in Rule 56(e):

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

The next and final issue is whether SAT should be held liable for what Thompson did.

## III. SHOULD A CORPORATION BY HELD LIABLE UNDER THE FALSE CLAIMS ACT FOR THE FRAUD OF AN AGENT WHO ACTS WITH APPARENT AUTHORITY IF THE COMPANY RECEIVED NO BENEFIT FROM THE FRAUD?

■ To answer this question, we must first clear away some preliminary obstacles erected by SAT. It first asserts that the "law is well established that questions of apparent authority are questions to be determined by a jury." Because there was no request for a jury trial in this case, we will assume that SAT meant that the apparent authority of Thompson was a question of fact. There may, in certain circumstances, be questions of fact bearing on the question of apparent authority. Here, however, we have determined that there were no genuine issues of material fact. Apparent authority is, therefore, a legal question. It is not disputed that Thompson at all times during the perpetration of the fraud held himself out to HUD and EDIC to be acting for and on behalf of SAT. Nor can there be any question that at all pertinent times Thompson was the general manager and one third owner of SAT. It follows ineluctably that Thompson was acting with apparent authority.

In *A.S.M.E. v. Hydrolevel Corp.,* 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330

---

**1.** Rule 801(d)(2)(E) states: "A statement is not hearsay if—(2) the statement is offered against a party and is (E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy."

(1982), the Court, in an anti-trust case, discussed general agency law and noted that "a principal is liable for an agent's fraud though the agent acted solely to benefit himself, if the agent acts with apparent authority." *Id.* at 566, 102 S.Ct. at 1942. It pointed out that, "[t]he apparent authority theory has long been the settled rule in the federal system." *Id.* at 567, 102 S.Ct. at 1943. The Court then held that "the apparent authority theory is consistent with the Congressional intent to encourage competition," *Id.* at 570, 102 S.Ct. at 1944, and applied it to the anti-trust case before it.

We followed the rationale of *ASME* in *In re Atlantic Financial Management, Inc.,* 784 F.2d 29 (1st Cir.1986), *cert. denied,* 481 U.S. 1072, 107 S.Ct. 2469, 95 L.Ed.2d 877 (1987), and held a corporation liable under the securities laws [2] although it had received no benefit from its agent's violations. In *Atlantic Financial,* we applied a two-step analysis. We first found that vicarious liability would apply unless there was statutory language or a statutory purpose that would preclude its imposition. After examining the statute, we found no language that precluded the application of vicarious liability and held that a vicarious liability standard would further the goals of the statute.

In another case interpreting *ASME,* we ruled, under the second part of the *Atlantic Financial* test, that the Racketeer Influenced and Corrupt Organizations Act (RICO) statute contains specific language that prevents the application of vicarious liability. *Schofield v. First Commodity Corp. of Boston,* 793 F.2d 28 (1st Cir.1983). In addition, we felt that the intention of Congress in passing RICO was to punish the individual wrongdoer rather than the broader purposes of deterrence and restitution inherent in the anti-trust and securities laws. *Id.* at 33.

In light of these cases, the question before us is whether the False Claims Act contains language that would preclude, or has a purpose that would not be served by, applying vicarious liability. We find that it does not. There is nothing in the language of the Act proscribing vicarious liability. The purposes of the False Claims Act are to make the government whole (restitution) and to deter fraud against the government. *See, e.g., Rainwater v. United States,* 356 U.S. 590, 592, 78 S.Ct. 946, 948, 2 L.Ed.2d 996 (1958) ("objective of Congress was broadly to protect the funds and property of the government"); *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 547, 550–51, 63 S.Ct. 379, 385, 387–88, 87 L.Ed. 443 (1943); *United States v. Griswold,* 24 F. 361, 366 (D.Or.1885) ("The statute is a remedial one. It is intended to protect the treasury against the hungry and unscrupulous host that encompasses it on every side and should be interpreted accordingly."). Both of those goals are served by vicarious liability. The statute is similar to the anti-trust and securities laws under which corporations are held vicariously liable in order to deter violations and to protect the public.

SAT argues that cases in the Fifth Circuit raise a question about whether *ASME* and the cases that follow it should be applied to the False Claims Act. *See, e.g., Grand Union Co. v. United States,* 696 F.2d 888, 891 (11th Cir.1983); *United States v. Hanger One, Inc.,* 563 F.2d 1155 (5th Cir.1977); *United States v. Ridglea State Bank,* 357 F.2d 495 (5th Cir.1965). These cases all require that the corporation receive a benefit in order to be held liable. Importantly, only *Grand Union* was decided after *ASME* and the opinion does not cite it. *But see U.S. v. Hill,* 676 F.Supp. 1158, 1178–79 (N.D.Fla.1987) (recognizing that *ASME* should be applied to False Claims Act cases but refusing to break with Fifth Circuit precedent). The line of cases of the Fifth Circuit, in light of *ASME* and First Circuit precedent, is not persuasive.

---

**2.** The case arose from a certified question concerning: "the relationship between a special section of the Securities Act of 1934, section 20(a), 15 U.S.C. § 78t(a), and various common law theories of vicarious liability (of which 'apparent authority' is one)." *Atlantic Financial,* 784 F.2d at 30.

We hold that a corporation should be held liable under the False Claims Act for the fraud of an agent who acts with apparent authority even if the corporation received no benefit from the agent's fraud.

We have considered the other issues raised by SAT and feel that they do not merit discussion.

AFFIRMED.