**UNITED STATES of America,**
Plaintiff,

v.

**DYNAMICS RESEARCH CORP.,**
**Defendant and Third–Party**
**Plaintiff,**

v.

**Gregg M. Azcuy & Storage Engine,**
**Inc., Third–Party Defendants.**

Civ. No. 03–11965–NG.

United States District Court,
D. Massachusetts.

July 17, 2006.

Sara M. Bloom, United States Attorney's Office, Boston, MA, Sara McLean, Department of Justice, Washington, DC, for Plaintiff.

Mark W. Pearlstein, Melissa L. Nott, Laura McLane, McDermott, Will & Emery, Boston, MA, for Defendant and Third–Party Plaintiff.

Alan R. Hoffman, Anne Hoffman, Norman Brown, III, Lynch, Brewer, Hoffman & Fink LLP, Boston, MA, Michael D. Blanchard, Bingham McCutchen LLP, Hartford, CT, Timothy P. Neumann, Broege Neumann Fischer & Shaver, LLC, Manasquan, NJ, for Third–Party Defendants.

### MEMORANDUM AND ORDER RE: MOTION TO DISMISS

GERTNER, District Judge.

This case was initiated by the United States of America ("the government") on October 9, 2003, when it filed a complaint alleging that Dynamics Research Corporation ("DRC") had violated the False Claims Act ("FCA") and Anti–Kickback Act ("AKA"), and breached its contracts with the government. DRC responded by filing a third-party complaint against Storage Engine, Inc. ("SEI") and Gregg M. Azcuy ("Azcuy"), alleging common law indemnification, contribution pursuant to M.G.L. c. 231B, and unfair and deceptive business practices in violation of M.G.L. c. 93A, § 11.

Both SEI and Azcuy now move to dismiss DRC's third-party complaint. DRC has filed a Motion for Relief pursuant to Fed.R.Civ.P. 56(f), requesting time to undertake discovery related to their claims. For the reasons articulated below, I hereby **DENY** DRC's Motion for Relief Pursuant to Fed.R.Civ.P. 56(f) and **GRANT** the motions to dismiss filed by Azcuy and SEI, with the exception of the § 93A claims, which will be stayed pending the outcome of the government's FCA and AKA claims against DRC.

### I. FACTS

DRC is a defense contractor located in Andover, Massachusetts. Beginning in 1996, DRC entered into at least two multi-million dollar technical services contracts with the government. Under the terms of the contracts, DRC was responsible for advising the United States Air Force ("USAF") on the procurement of computer equipment.

In January 1996, DRC entered into the Technical Management Support contract ("TEMS IV") with USAF. Under TEMS IV, DRC would ultimately receive more than $13.5 million in exchange for technical support and advice concerning the acquisition, procurement, development, and deployment of computer systems for USAF. The contract expired in March of 1999. DRC also entered into the Information Technology Services Program ("ITSP") contract with USAF, which began in 1997 and concluded in 2000. Both contracts required that DRC avoid, neutralize, or mitigate organizational conflicts of interest.

The government alleges that DRC failed to obtain from its executives the conflict of interest certifications required by the government, that it made false statements regarding its compliance with this contractual term in order to receive future government contracts, and that DRC defrauded the government of more than $10 million through a series of schemes. These schemes were conducted by DRC's program manager, Paul Arguin, and one of its vice presidents, Victor Garber. The government has alleged that DRC was involved in five different fraudulent schemes. The three involving SEI are detailed below:

### Scheme One

DRC recommended that USAF purchase 185 computers known as "Ravens" from SEI though another company, World Wide Technology ("WWT"). The government alleges that DRC caused SEI to overcharge USAF $500 per Raven, for a total of $92,500. This money was then paid to Greenleaf Associates ("Greenleaf"), a company owned by Arguin's wife.

### Scheme Two

Arguin and Garber next helped a former DRC employee organize his company, KKP, to receive labor and services contracts from USAF. DRC assisted KKP in gaining certification as a "small disadvantaged business." Having received this designation KKP was able to receive government contracts outside of the normal competitive bidding channels used by USAF.

KKP allegedly then became a subcontractor of DRC and began serving as a conduit for the $500 kickbacks received through overcharging USAF. These payments were ultimately distributed by KKP to entities controlled by Arguin and Garber and, indirectly, to friends and family. In order to hide the true nature of the payments, they were labeled as "installation" charges, though no services were ever provided and USAF did not authorize such services. Through this scheme, DRC caused SEI, which was allegedly providing the computer equipment used in the scheme, to overcharge the government $439,000 by having KKP submit invoices for services never rendered.

### Scheme Three

In June 1997, DRC allegedly purchased 726 units of RAM memory for USAF. Each unit cost $1,027.57, for a combined total of $746,015.82. DRC then instructed SEI to order the RAM units and hold them until they received further notice. In February 1998, DRC had SEI deliver the units to Arguin's house.

Arguin subsequently notified USAF that it needed to purchase another 700 RAM units and that KKP was the preferred provider. He then arranged KKP to submit a quote of $1,032.44 per unit for 700 units, totaling $722,708. KKP paid for the RAM, which was then delivered from Arguin's residence to USAF. The remaining units were sold in a similar fashion. As a result, DRC allegedly caused USAF to pay twice for the same RAM units. The proceeds from the alleged fraud were distributed among Arguin, Garber, the head of KKP, and assorted relatives and friends.

### A. The Fall Out

In October 2000, Arguin and Garber were indicted for conspiracy to defraud the government, wire fraud, theft of public property, conspiracy to commit money laundering offenses, money laundering, conspiracy to obstruct justice, witness tampering, aiding and abetting, and forfeiture. In March 2002, the two men pled guilty to conspiring to defraud the government, conspiring to obstruct justice, multiple counts of wire fraud, and witness tampering. DRC was not a defendant in the criminal case.

The third-party defendants, Steam Engine, Inc. ("SEI") and Gregg Azcuy ("Azcuy"), have each entered into settlement agreements with the government. The government settled its claims with Azcuy for $75,000 in September 2004 and SEI later settled for $150,000.

## II. PROCEDURAL HISTORY

Azcuy first moved to dismiss DRC's counterclaims in October 2004. SEI followed suit in December 2004 and Azcuy filed an amended motion to dismiss days later. Both third-party defendants claim that DRC is barred from seeking remuneration from them because of their settlements with the government, and that they

are not liable for either indemnification or contribution as a matter of federal law. The motions to dismiss and motion for 56(f) relief were referred to Magistrate Judge Alexander for a Report and Recommendation ("R & R"), and the Magistrate held a hearing on the various motions on March 29, 2005. On October 5, 2005, the Magistrate issued an R & R in which she recommended that the motions to dismiss be denied and the motion for relief pursuant to Fed.R.Civ.P. 56(f) be allowed. I hereby **ADOPT IN PART** the R & R insofar as it denies the motion to dismiss the ch. 93A claims, but I do not adopt the remainder of the report.

## III. *DISCUSSION*

### A. *Legal Standard*

▮ The district court must review a magistrate's findings and recommendations de novo when a party objects to a magistrate's recommendation regarding a dispositive motion. *See* 28 U.S.C. § 636(b)(1)(C); *United States v. Raddatz*, 447 U.S. 667, 673–74, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). Following review, the "judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions." 28 U.S.C. 636(b)(1)(C).

### B. *Right to Contribution and Indemnification Under the AKA & FCA*

Azcuy and SEI assert that DRC is barred from proceeding with indemnification and contribution claims under both the FCA and AKA. I agree.

### 1. *FCA*

In *Mortgages, Inc. v. United States Dist. Court for Dist. of Nevada*, 934 F.2d 209 (9th Cir.1991), the Ninth Circuit ruled that counterclaims for indemnification and contribution are unavailable to third-party defendants in FCA actions. *Mortgages* involved a situation in which the United States brought an FCA suit on the recommendation of a mortgage company. The company remained in the case as a qui tam plaintiff. Defendants filed a third-party complaint against the mortgage company, seeking indemnification and/or contribution. The mortgage company's motion to dismiss was denied by the district court, but the Ninth Circuit ultimately reversed for the reason cited above. No other Courts of Appeals have addressed this question,[1] though several district courts have endorsed the Ninth Circuit's ruling.[2] *See, e.g., U.S. ex rel. Scott v. Metrop. Health Corp.*, No. 1:02–CV–485, 2005 WL 3434830, at *11 (W.D.Mich. Dec. 13, 2005); *U.S. ex rel. Mikes v. Straus*, 931 F.Supp. 248, 261–62 (S.D.N.Y.1996); *U.S. ex rel. Pub. Integrity v. Therapeutic Tech., Inc.*, 895 F.Supp. 294, 296 (S.D.Ala.1995); *U.S. ex rel. Stephens v. Prabhu*, No. CV–S–92–653–LDG, 1994 WL 761237, at *1 (D.Nev. Dec. 14, 1994).

▮ The right to contribution and indemnification is no different from other implied rights of action. *Mortgages*, 934 F.2d at 212 (citing *Levit v. Ingersoll Rand Fin. Corp.*, 874 F.2d 1186, 1191 (7th Cir. 1989)). "A defendant held liable under a federal statute has a right to contribution or indemnification from another who has violated the statute only if such right arises (1) through the affirmative creation

---

[1]. The 11th Circuit has also broached the question and suggested in dicta that it would rule the same way. *See Israel Disc. Bank Ltd. v. Entin*, 951 F.2d 311, 315 n. 6 & n. 9 (11th Cir.1992).

[2]. No district courts have questioned *Mortgage's* ruling that indemnification and contribution counterclaims are impermissible in FCA actions.

of a right of action by Congress, either expressly or implicitly, or (2) via the power of the courts to formulate federal common law." *Id.* (citing *Texas Indus., Inc. v. Radcliff Materials,* 451 U.S. 630, 638, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981); *Northwest Airlines v. Transp. Workers Union of America,* 451 U.S. 77, 90–91, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981)).

Because the False Claims Act does not explicitly speak of a right to contribution or indemnification, courts must look to the statute's legislative history. *Id.* at 213; *Texas Indus.,* 451 U.S. at 639, 101 S.Ct. 2061. The Ninth Circuit was unable to find anything in the legislative history that mentioned contribution or indemnification. *Mortgages,* 934 F.2d at 213. DRC fared no better. Thus, it seems clear that "Congress did not intend to create a right of action for contribution or indemnification under the FCA." *Id.*

 As Congress did not intend to create a right of indemnification or contribution, it may arise only if created by federal common law. Federal common law exists only in a few, limited circumstances: namely, where (1) "a federal rule of decision is 'necessary to protect uniquely federal interests,'" *Texas Indus.,* 451 U.S. at 640, 101 S.Ct. 2061 (citation omitted), (2) a statute makes clear that it expects courts to give shape to its mandate by drawing on common-law traditions, *Nat'l Soc'y of Prof. Eng'rs v. United States,* 435 U.S. 679, 688, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978), or (3) strong national or federal concerns dominate an area, such as admiralty and controversies between states. *Mortgages,* 934 F.2d at 213–14 (citing *Sederquist v. Court,* 861 F.2d 554, 556 (9th Cir.1988)). As explained in *Mortgages,* counterclaims for indemnification and contribution in FCA actions do not fall into any of the above-cited exceptions. *Id.* DRC has not provided this Court with any reason to think otherwise.

Instead of arguing *Mortgages* head on, DRC unsuccessfully tries to distinguish the facts of its case from those before the Ninth Circuit. Towards this end, DRC advances two arguments: First, that *Mortgages* applies only to defendants seeking a remedy against qui tam plaintiffs with unclean hands. And second, that *Mortgages* does not apply to cases, like the instant case, in which defendant's liability is vicarious and not direct. Neither argument is persuasive.

DRC's first argument misconstrues the Court's analysis in *Mortgages.* The Ninth Circuit's opinion relies very little on the fact that the defendant in its case was seeking damages from a qui tam plaintiff. None of the steps in the Court's analysis hinged on the identity of the potential indemnitee/contributee. Similarly, the legislative history did not simply lack reference to contribution/indemnification claims against qui tam plaintiffs: It lacked reference to contribution or indemnification claims being available against *any* party. Finally, nothing in the Ninth Circuit's federal common law analysis suggests that the court would have arrived at a different conclusion if the potential indemnitee had been a third party (like Azcuy or SEI) instead of a qui tam plaintiff (as in *Mortgages*). For purposes of the Court's implied right of action analysis, DRC's asserted factual discrepancy is a distinction without a difference.

Much like its first argument, DRC's attempt to imbue its status as a vicariously liable defendant with legal significance is unavailing. None of the Ninth Circuit's analysis is dependent on the vicarious/direct liability distinction and DRC cannot casually cast *Mortgages* aside by noting that the defendant in *Mortgages* was not vicariously liable. Moreover, the First Circuit has explicitly stated that no such weight should attach to the vicarious/direct

liability distinction in FCA cases. In *United States v. O'Connell,* 890 F.2d 563 (1st Cir.1989), the First Circuit considered "whether the False Claims Act contains language that would preclude, or has a purpose that would not be served by, applying vicarious liability." *Id.* at 568. According to the Court, the FCA has two purposes: making the government whole and restitution. *Id.* As the Court concluded, "[b]oth of [these] goals are served by vicarious liability." *Id.* Thus, DRC cannot reasonably argue that the FCA intended to bar contribution and indemnification for directly liable defendants, but permit vicariously liable defendants to utilize these rights of action because they are somehow less culpable. In the eyes of the FCA, vicariously liable and directly liable defendants have the same legal standing.

For these reasons I hold that DRC is not entitled to indemnification or contribution from Azcuy or SEI for any violation of the FCA that may be found in this case.

## 2. *AKA*

■ To date, no court has ruled on whether the Anti–Kickback Act precludes defendants from bringing indemnification or contribution counterclaims.[3] As such, the issue is one of first impression in this Court.

Like the FCA, the AKA provides no statutory language that even mentions contribution or indemnification, much less an intention to create a right to either. Thus, if either right of action exists, it must be implied.

The Supreme Court has repeatedly cautioned courts against the creation of new causes of action. *Musick, Peeler & Garrett v. Employers Ins. of Wausau,* 508 U.S. 286, 291, 113 S.Ct. 2085, 124 L.Ed.2d 194 (1993); *Univs. Research Ass'n., Inc. v. Coutu,* 450 U.S. 754, 770, 101 S.Ct. 1451, 67 L.Ed.2d 662 (1981); *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 15–16, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575–77, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). According to the Court, the creation of new rights is a matter best left to the legislative branch. *Musick, Peeler & Garrett,* 508 U.S. at 291, 113 S.Ct. 2085.

■ When courts do consider whether to find an implied right of action, they should focus on Congress' intent.[4] *Texas Indus., Inc.,* 451 U.S. at 639, 101 S.Ct. 2061. *See also Mortgages,* 934 F.2d at 212 n. 3 (explaining that while *Texas Industries* addresses only the right to contribution, the legal framework behind the case has been extended to indemnification as well). Courts can discern Congressional intent from looking at the Act's legislative history and considering other factors such as "the identity of the class for whose benefit the statute was enacted, the overall legislative scheme, and the traditional role of the states in providing relief." *Texas Indus., Inc.,* 451 U.S. at 639, 101 S.Ct. 2061.

Both parties agree that the legislative history is silent as to any right for contribution or indemnification. However, DRC asserts that the legislative history evinces a clear intent on behalf of Congress to allow those liable under the act to seek

---

**3.** Azcuy and SEI dispute this proposition, citing *United States v. Hutchins,* 47 F.R.D. 340 (D.Or.1969). While it is possible to read *Hutchins* in the way proposed by Azcuy and SEI, the case is vague, very brief, and provides little insight into the court's reasoning. Perhaps more to the point, it is over 37 years old and was written almost two decades before the AKA was amended in 1986. Thus, it is difficult to draw any conclusions of lasting value from the decision.

**4.** *See* discussion *supra.*

compensation from other wrongdoers. This assertion is correct only in part.

In the legislative history, Congress considered an argument from the industry representatives of prime contractors, averring that "prime contractors should not be held civilly liable for including kickback costs in prime contract prices because, in many cases, they do not know they are doing it." S.Rep. No. 99–435, at 14 (1986). Congress dismissed this contention for three reasons. First, the employees of prime contractors are often key participants in the fraud and, in fact, comprise the majority of individuals in the defense industry who have been convicted under the Act. *Id.* at 14–15. Second, prime contractors are better situated than the government to detect and prevent kickback schemes. "They need incentives, however, to exercise their oversight capabilities. Civil liability for kickback costs is one such incentive." *Id.* at 15.

DRC focuses on the third reason given by Congress, namely, "that the prime contractor is usually better situated to recover damages from the party most responsible for the wrongdoing." *Id.* This statement, DRC asserts, is sufficient proof that Congress gave its blessing to an implied right of action for indemnification and contribution. However, the next sentence undercuts DRC's position, making it clear that Congress had particular contract remedies in mind. Congress continued, "For example, the prime contractor may have direct contractual relationships with the wrongdoer which will enable the prime contractor to exercise offset privileges or arrange settlements not available to the United States. Prime contractors may even have contract provisions which will enable them to recover kickback costs in case of a suit by the Government." *Id.* Tellingly, Congress makes no mention of its having any interest in creating a mechanism for shifting liability in such cases. It simply lists the pre-existing remedies that may be available to defendants.

Moreover, it is clear that the Anti–Kickback Act was not passed by Congress with the intent to benefit individuals who accept kick-backs and pass the added expense on to the government. *See Piper v. Chris–Craft Indus., Inc.,* 430 U.S. 1, 37, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977). *See also Texas Indus., Inc.,* 451 U.S. at 639, 101 S.Ct. 2061; *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) (explaining that one relevant factor in determining if a right of action exists is whether plaintiff was "one of the class for whose especial benefit the statute was enacted. . . ."). On the contrary, it was developed to regulate and punish the wayward activities of those, allegedly like DRC, who accept kick-backs. The party intended to benefit from the statute was the government.

Where the legislative history lacks reference to indemnification or contribution and does not suggest "any possibility that Congress was concerned with softening the blow on joint wrongdoers," examination of other factors is unnecessary. *Texas Indus., Inc.,* 451 U.S. at 639, 101 S.Ct. 2061 (citing *California v. Sierra Club,* 451 U.S. 287, 298, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981); *Touche Ross & Co.,* 442 U.S. at 574–76, 99 S.Ct. 2479). In the AKA context, there is no evidence at all, much less the "clear implication" required by the Supreme Court, that Congress intended either to create a right of indemnification or contribution or to soften the blow on those found liable under the statute. Congress discussed the fact that violators of the AKA might have pre-existing remedies in contract law, but it expressed no desire to create or recognize additional remedies. Moreover, there is a solid argument that allowing a right to indemnification or contribution—particularly indemnification, given its complete shifting of liability—is

in tension with the statute's goal of providing prime contractors with an incentive to exercise their oversight capabilities.

Any implied right of action, then, must result from the creation of federal common law. But as the FCA discussion above made clear, there is no reason to think that this situation is one of the "few and restricted" areas in which courts may generate federal common law. DRC has provided no reason to think otherwise.[5]

For the aforementioned reasons, I find that the AKA does not provide an implied right of action for indemnification or contribution.

### C. Common Law Indemnity

Although the need for further indemnity and contribution analysis is obviated by the preceding discussion, I want to touch briefly on the reasons that neither claim would survive, irrespective of my ruling on the FCA and AKA.[6]

SEI and Azcuy have both moved to dismiss DRC's indemnity claim, arguing that as a matter of law DRC cannot meet any of the necessary criteria. The First Circuit has clearly established:

> [t]hree different sets of circumstances may give rise to a [common law] right to indemnification. First, an express agreement may create a right to indemnification. Second, a contractual right to indemnification may be implied from the nature of the relationship between the parties. Third, a tort-based right to indemnification may be found where there is a great disparity in the fault of the parties.

*Araujo v. Woods Hole,* 693 F.2d 1, 2 (1st Cir.1982) (citations omitted); *see also Medeiros v. Whitcraft,* 931 F.Supp. 68, 75 (D.Mass.1996) (same).

▮ None of these theories supports DRC's claim for indemnification. The first theory is clearly inapplicable here as neither party contends that an express agreement regarding indemnification existed. The second theory, which is the one that DRC appears to focus its argument on,[7] requires DRC to show the existence of an implied contractual right of indemnification. This Court has made clear that a "contractual right to indemnification will only be implied when there are unique special factors demonstrating that the parties intended that the would-be indemnitor bear the ultimate responsibility for the plaintiff's safety ... or when there is a generally recognized special relationship between the parties." *Medeiros,* 931 F.Supp. at 75 (quoting *Araujo,* 693 F.2d at 2–3).

DRC advances two arguments, neither of which adequately addresses *Medeiros.* First, defendant argues that "Massachusetts courts have explicitly recognized claims for indemnity" even where there is no special relationship. In support of this argument, DRC cites one case that says nothing of the sort, *Santos v. Chrysler,* 430 Mass. 198, 715 N.E.2d 47 (1999), cites another vague case from 1943 that is, itself, citing a proposition from an 1873 case, *Hollywood Barbecue Co. v. Morse,* 314 Mass. 368, 369–70, 50 N.E.2d 55 (1943), and ignores Massachusetts case law that stands for the opposite proposition. *See,*

---

**5.** *See also* discussion of federal common law in the FCA context, *supra.*

**6.** To the extent that DRC asserts its contribution and indemnification claims as "independent" damages because they are brought pursuant to state law or state common law, *Madden* and *Mortgages* would also preclude

DRC from bringing such claims. *See* § 93A discussion *infra.*

**7.** DRC's indemnification arguments are not entirely clear and illustrate substantial reliance on the "ships passing in the night" theory of legal argument.

*e.g., Fireside Motors, Inc. v. Nissan Motor Corp.*, 395 Mass. 366, 374–74, 479 N.E.2d 1386 (1985) (relying on "special relationship" test set forth in *Araujo* ). In short, DRC's position is not clearly supported by either of the cases that it cites, and is in tension with the legal standard articulated by the Supreme Judicial Court of Massachusetts, First Circuit, and District of Massachusetts.

■ DRC also advances a second argument, asserting that *Araujo* and *Medeiros* are inapplicable because they do not involve vicariously liable third-party plaintiffs like DRC. DRC does not, however, cite any case law in support of its position. Nor does it seem to recognize the import of the standard articulated in *Araujo* and *Medeiros*. *Medeiros* makes clear that the contractual right to indemnification applies in only two circumstances: where special factors make it clear that the would-be indemnitor was intended to bear liability and where a special relationship exists between the parties. DRC never argues that its indemnification claim fits in either category. DRC's lack of direct liability may assist it in meeting the "no fault" requirement for an indemnification claim, but it does not help in satisfying the additional criteria established in *Araujo* and *Medeiros*. Because DRC has established no legal basis for its indemnification claims, I hereby **GRANT** the motion to dismiss DRC's indemnification counterclaims.

### D. *Contribution Pursuant to M.G.L. c. 231B and Motion for 56(f) Relief*

The third party defendants have also moved to dismiss DRC's contribution claim, arguing that the claim is barred by the settlement rule. DRC disagrees and argues that it is entitled to discovery under Fed.R.Civ.P. 56(f).

■ M.G.L. c. 231B, § 4 states, "[w]hen a release . . . is given in good faith to one of two or more persons liable in tort for the same injury . . . it shall discharge the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor." *Id.* As such, good faith settlement is a bar to contribution under Massachusetts law. *See, e.g., Slocum v. Donahue*, 44 Mass.App.Ct. 937, 693 N.E.2d 179 (1998). "This rule, which is intended to encourage settlement, represents the realization that a joint tortfeasor will be unlikely to settle if he remains open to contribution claims." *Chapman v. Bernard's Inc.*, 198 F.R.D. 575, 577 (D.Mass.2001). *See also Noyes v. Raymond*, 28 Mass.App.Ct. 186, 548 N.E.2d 196 (1990) (explaining that purpose of § 231(B) is to encourage settlements).

■ The first step in determining whether the third-party plaintiffs are safeguarded from DRC's contribution cross-claims is to decide whether the settlement agreements were entered into in good faith. M.G.L. c. 231B, § 4 does not define lack of good faith, but Massachusetts courts have explained that it "includes collusion, fraud, dishonesty, and other wrongful conduct." *Id.* at 190, 548 N.E.2d 196. The mere fact that a settlement amount is low in comparison to the potential harm caused is not, by itself, material to the good faith determination. *Id.* "A relatively low settlement amount might well reflect uncertainty whether the settling party would be found liable, uncertainty whether the damages would be proved, or the general unpredictability of juries on both liability and damage issues." *Id.*

The initial burden of establishing good faith is placed on the party seeking discharge. *Id.* at 191, 548 N.E.2d 196. Azcuy and SEI can meet this burden by showing that a settlement has been agreed upon and by establishing its basic terms. *Id.* The burden then shifts back to the other party, which is required to raise a legitimate issue of good faith. *Chapman,*

198 F.R.D. at 578. If the non-settling party can raise a legitimate issue of good faith then it is entitled to an evidentiary hearing, but such hearings should be the exception given the statute's goal of encouraging settlement. *Id.* (citing *Noyes,* 28 Mass.App.Ct. at 189–91, 548 N.E.2d 196).

Both Azcuy and SEI have met their initial burdens by providing the Court with copies of their settlement agreements with the government. As such, DRC must meet its burden by showing a legitimate issue concerning the good faith of the settlement agreements. DRC has provided no reason to think that the government's settlement with the two third-party defendants was collusive, fraudulent or otherwise dishonest. Nor has DRC alleged any reason why the government would collude with the third-party plaintiffs. All that DRC has offered is that the settlement agreements with Azcuy and SEI are dramatically lower than the sum sought by the government from DRC. As discussed above, the fact that a settlement is low is not, itself, a material factor.

DRC attempts to escape this legal pickle by arguing that it is not alleging a good faith violation solely on the basis of the low settlement figure, but also on the basis of the lack of proffered evidence regarding the financial condition of the third-party defendants, the existence of relevant insurance coverage, and any legal impediments to bringing claims against them. This argument is not persuasive. First, this requirement is not tethered to any apparent law. Second, the government stated at the recent motion hearing that the size of the settlements was due to the financial condition of the third-party defendants. Third, DRC's burden is to provide a legitimate reason to suspect that the settlement may have been dishonest. They have provided no such reason here.

DRC is not entitled to discovery because they have not provided any reason to doubt the good faith basis of the settlements. Allowing discovery without any prima facie showing on DRC's part would impose a substantial litigation burden on the third-party defendants, exactly the sort of thing prohibited by the settlement bar rule. Also, DRC's attempts to avail itself of relief pursuant to Fed.R.Civ.P. 56(f) cannot succeed here in a motion to dismiss under Fed. R. Civ. P 12(b)(6). This is not a motion for summary judgment and 56(f) does not apply in this context.

### E. *Chapter 93A Claims*

■ The third party defendants have also moved to dismiss DRC's claims for damages under M.G.L. c. 93A, § 11. Section 11 relates to actions for unfair business practices. According to Azcuy and SEI, DRC's ch. 93A claims are merely duplicative of its indemnification and contribution claims and, as such, should be preempted by the FCA and AKA. DRC counters with the argument that preemption should not apply because ch. 93A claims are "independent damages," separate and apart from the indemnification and contribution claims. I agree with DRC that ch. 93A claims are independent damages. As independent damages, these claims are not preempted by the FCA or AKA, unless DRC is found liable for violating either act.

In *United States ex rel Madden v. Gen. Dynamics Corp.,* 4 F.3d 827 (9th Cir.1993), the Ninth Circuit clarified its position on counterclaims made by defendants in FCA cases. According to the Court, the Central District of California had erred in dismissing counterclaims by a defendant in an FCA action. The district court had believed that according to the logic of *Mortgages,* "the FCA did not intend to ameliorate the liability of wrongdoers by providing defendants with a remedy

against a qui tam plaintiff with 'unclean hands.' " *Id.* at 830 (citations omitted). Because the counterclaims would serve to ameliorate the liability of wrongdoers, the court reasoned, they must be dismissed.

In overturning the district court's counterclaim decision, the Ninth Circuit drew a distinction between counterclaims seeking indemnification and/or contribution and counterclaims seeking "independent damages." *Id.* The Court reasoned that *Mortgages* had been concerned with preventing defendants from offsetting their liability. And while contribution and indemnification claims only have the effect of offsetting liability, claims for independent damages are distinguishable because they are not dependent on a defendant's liability. *Id.*

The Ninth Circuit admitted that its "decision may encourage qui tam defendants to bring counterclaims for independent damages instead of indemnification." *Id.* at 831. The Court was not concerned that this would lead to an end run around *Mortgages,* explaining that it "is possible to resolve the issue of a qui tam defendant's liability before reaching the qui tam defendant's counterclaims." *Id.* Thus, "[i]f a qui tam defendant is found liable, the counterclaims can ... be dismissed on the ground that they will have the effect of providing for indemnification or contribution. On the other hand, if a qui tam defendant is found not liable, the counterclaims can be addressed on the merits." *Id.*

The reasoning from *Madden* is directly applicable to the instant case. Third-party defendants argue that DRC's ch. 93A claim must be dismissed because, as a functional matter, it would provide for indemnification. But *Madden* directly contradicts this point: the ch. 93A claim cannot provide for indemnification if DRC is found not liable. Consequently, DRC may proceed with its ch. 93A claim if it is found not liable, but cannot proceed with

the claim if it is found liable because in this scenario the ch. 93A claims would have the effect of providing for indemnification.

Of course, this raises the issue of what will remain of DRC's ch. 93A claims if DRC is found not to be liable under the AKA or FCA. If the ch. 93A damages were precisely coterminous with its contribution and indemnification claims, DRC would not be able to recover any damages if it is found not to be liable; there would be no liability to shift. However, DRC has asserted here that its ch. 93A claims are not entirely coterminous with indemnification and contribution. To the extent that this is true, DRC may still be able to collect damages after its liability under the federal acts is determined.

## IV. CONCLUSION

For the reasons set forth above, I hereby **DENY** DRC's motion for relief pursuant to Fed.R.Civ.P. 56(f) (document # 51) and **GRANT** in part and **DENY** in part Azcuy and SEI's motions to dismiss (document # 60, document # 58). The motions to dismiss are granted with respect to the contribution and indemnification claims. With respect to the ch. 93A claims, the motions are denied/stayed pending resolution of the government's FCA and AKA claims again DRC. Additionally, on October 5, 2005, Magistrate Judge Alexander issued an R & R in which she recommended that the motions to dismiss be denied and the motion for relief pursuant to Fed.R.Civ.P. 56(f) be allowed. I hereby **ADOPT IN PART** the R & R insofar as it denies the motion to dismiss the ch. 93A claims, but I do not adopt the remainder of the report.

**SO ORDERED.**